Hazel Morgan HICKS et al.

v.

UNITED STATES of America,
Appellant.

No. 73–1929.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1974.

Decided April 11, 1975.

Michael G. Scheininger, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Derek I. Meier, Asst. U. S. Attys., were on the brief for appellant. Harold H. Titus, Jr., U. S. Atty. at the time the record was filed, also entered an appearance for appellant.

George W. Shadoan, Rockville, Md., for appellees.

Before FAHY, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge FAHY.

Concurring opinion filed by Circuit Judge TAMM, with whom Circuit Judge McGOWAN joins.

FAHY, Senior Circuit Judge:

Plaintiffs in the District Court, appellees in this court, are co-administratrices of the estate of Corinne Morgan, deceased. They sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671,[1] and also under the District of Columbia survival statute, 12 D.C.Code § 101. The complaint attributed the death of Corinne Morgan to the negligence of St. Elizabeths Hospital (the Hospital) as agent of the United States. She was killed by her husband, Joseph Morgan, who had been a patient at the Hospital, and who shot her after he had been given his liberty in circumstances, allegedly, of negligence on the part of the Hospital which were a proximate cause of the homicide. The case was tried by Judge Curran of the District Court without a jury, and resulted in a judgment for plaintiffs of $90,000 under the Federal Tort Claims Act, and of $10,000 under the survival statute. Hicks v. United States, 357 F.Supp. 434 (D.D.C.1973). The amount of the judgment is not challenged. It is the liability of the United States that is in question. We affirm.

## I

### THE FACTUAL SITUATION

Morgan for many years had been a heavy drinker. Prior to the homicide he had been arrested for drunkenness, disorderly conduct or assault at least sixteen times between 1957 until the homicide in 1967. His wife had been the complainant on eight of these occasions.

On July 11, 1966, she obtained a warrant for his arrest for assault upon her on July 7. In the affidavit which was the basis for the warrant she averred that she had been kicked, choked and beaten by him and that he had also threatened to murder her. According to her statement, Morgan was intoxicated at the time. He was arrested July 12 and arraigned the same day in the Court of General Sessions of the District of Columbia, superseded now by the Superior Court of the District of Columbia. The court committed him to the District of Columbia General Hospital to determine his competency. On August 11, that hospital reported to the Court of General Sessions in considerable detail.[2] The report stated that Morgan was suffering from "a moderately severe organic brain syndrome," and that "[t]his condition is due to actual brain damage, and is probably a result of prolonged, excessive drinking." 357 F.Supp. at 436. The report also stated:

It is our opinion that the patient's mental impairment is such that he is not yet ready to function in society. This type of brain condition sometimes clears with the passage of time, good diet, and absolute abstinence from alcohol. We therefore think it would be important for him to receive further treatment and hospitalization, and recommend that he be committed to St. Elizabeths Hospital for the same. It is also our recommendation that he be given psychological tests in one month, and then again in six months (whether in the hospital or not) to see if there is any change in his mental condition.

*Id.*

The report nevertheless gave the opinion that the patient was able to understand the nature of the charge against him and "despite his impaired mental

---

1. 28 U.S.C. § 1346(b) permits recovery against the United States for injury or death caused by the negligent act or omission "of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Section 2671 defines "employee of the Government" as used in section 1346(b) to include officers or employees of any federal agency.

2. See, *Hicks, supra,* at 436.

functioning, probably able to assist counsel in his defense and competent to stand trial." *Id.* The court, however, found him incompetent to stand trial and on August 12, 1966, committed him again, this time to St. Elizabeths.

The Clinical Record of the Hospital contains a report of October 21, 1966, made by a Psychiatric Social Worker on the basis of an interview with Mrs. Morgan. It notes that among the number of previous charges against him six were,

> drunk in house, disorderly and assault. Mrs. Morgan reports that although patient [Morgan] has been drinking heavily for the past 12–15 years, his behavior had become much more unbearable in the past few years.

> \* \* \* \* \* \*

> The informant [Mrs. Morgan] is contemplating separation or divorce as she does not wish to live again with the patient . . ..

> \* \* \* \* \* \*

> . . . patient's family can definitely not be used as a community resource as they are afraid of him and are not interested in having him back in the home.

> \* \* \* \* \* \*

> [The] relationship [between Morgan and Mrs. Morgan] is estimated to have been quite destructive for marital partners.

The Clinical Record shows also that a "Psychological Summary" was made October 25, 1966, by Dr. Borriello at the request apparently of the ward in which Morgan was living at the Hospital. It contains the following under the heading "General Impression":

> Outstanding in the test results is organic brain damage due to the effects of a long history of alcohol consumption. Inner resources for the effective and efficient solution of every day problems are lacking. Stressful situations can bring on emotionally labile acting out aggressive behavior.

> \* \* \* \* \* \*

> Women pose a threat to him and he does not have adequate understanding of his feelings, needs and desires in relation to them. He places insatiable demands upon them that they could never satisfy and which could result in him a violent rage that he could possibly act out.

> In general the projective test protocols are confirmatory of the general impression.

On October 26, 1966, the Clinical Record, moreover, contains a report of his "Psychiatric Case Study." It states, *inter alia*:

> On July 7, 1966, the patient's wife called the police complaining that he was drunk and had been beating, choking and kicking her and had threatened to kill her. This was the eighth time Mrs. Morgan had him arrested for similar reasons.

> Mr. Morgan has had at least 16 arrests since 1957, at which time he was 31 years old, for being drunk and disorderly or assault. In eight of these his wife was the complainant.

> \* \* \* \* \* \*

> The marriage was fraught with problems almost from the start, with a couple relating to each other in a mutually destructive manner. The patient has been drinking excessively now for approximately 15 years.

This study, made by a Senior Psychiatric Resident, and signed by the Clinical Director of the West Side Division of the Hospital,[3] refers to the report of the District of Columbia General Hospital as revealing "psychologicals which evidenced organicity. He was described as lucid, friendly, and cooperative and was given a diagnosis of organic brain syndrome, moderately severe."

The study further states,

> There was no evidence of an underlying psychosis. . . . Psychological testing revealed marked evidence of

---

3. He had also approved the Psychological Summary of October 25, 1966.

organicity and personality factors consistent with alcoholism.

\*  \*  \*  \*  \*  \*

[There was] no evidence of hallucinations or delusions. He remained oriented in all spheres, showed appropriate affect, and posed a problem only in the assessment of memory loss in the presence of such massive denial. He has a tendency to be impulsive and react quickly when angry.

On October 27, 1966, the same Senior Psychiatric Resident made a "Recommendation for Diagnosis and Discharge to Court." This report was a virtually verbatim recital of the previous day's study, except it concluded in the following language:

.  .  . Those who know him best feel that he is ready soon to return to Court for trial.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

| | |
|---|---|
| Recommended Diagnosis: | 02.1 Acute Brain Syndrome Associated with Alcohol Intoxication. (Recovered). |
| Recommendations: | In our Opinion, |

1. He is mentally competent to stand trial.

2. On or around July 9, 1966, he was suffering from a mental disorder, acute brain syndrome due to alcohol intoxication, from which he has now recovered, and the alleged offense with which he is charged, if committed by him, was a product of his illness.

| | |
|---|---|
| Condition on Discharge: | Recovered. |

---

Shortly before Morgan was released from St. Elizabeths in January, 1967, he was visited by his wife, one of his sons, his daughter (one of the appellees) and her husband.

According to testimony given by the daughter at trial, Morgan began,

".  .  . yelling that he was going to kill her [Mrs. Morgan] when he got out because she was the reason for him being over there: it was her fault. .  .  . [W]e had to take my mother out of the visiting room."

The son's testimony at trial supported this account and added that he had accompanied his mother, immediately after the incident, when she sought assurances from an employee of the Hospital that she would be notified if her husband was released, or if she would have to go to court.

On January 30, 1967, Morgan was discharged by the Hospital as recovered, to appear in court. Mrs. Morgan did not appear and a nolle prosequi was entered. A copy of the case jacket of the Court of General Sessions which is before us—the original we are advised has been lost—bears a stamped legend, "Jan 30 1967 Nolle Prosequi in Open Court." A nolle prosequi did not require the court's approval and none is indicated.[4] The fol-

4. "The United States Attorney and the Corporation Counsel may file a dismissal or nolle prosequi of an information or complaint and the prosecution shall thereupon terminate. .  .  ." Rule 48(a), D.C. Court of General Sessions Criminal Rules, January, 1970.

lowing in handwriting also appears on the jacket: "See Letter attached from St. Eliz. Hosp. Set for hearing 1–19–67," a stamped "Jan 19 1967" and a handwritten "C 1/26/67 Return to Hospital." These entries indicate that the case had been set for hearing January 19, was on that day continued to January 26, when Morgan was returned to the Hospital, followed on January 30 by the nolle prosequi. Morgan had been discharged to the court by the Hospital and went free when the charge against him was dismissed on the nolle prosequi.

The letter referred to as "from St. Eliz. Hosp." was from the then Superintendent of St. Elizabeths, dated December 19, 1966, addressed to the Clerk of the Criminal Division of the District of Columbia Court of General Sessions, and reads as follows:

It is the opinion of the physicians that Mr. Morgan has recovered from his mental disorder, Acute Brain Syndrome Associated With Alcohol Intoxication, and that he is now mentally competent to stand trial in that he has a rational and reasonable understanding of the nature of the charge against him and can properly assist counsel in his defense. These determinations were made on the basis of psychiatric examinations which indicate that there is no evidence of delusions or hallucinations, that he is oriented in all spheres, shows appropriate affect and can discuss the charges rationally. Perception, comprehension and memory are within normal limits. Intellectual functions are in the borderline range. There is indication that he was suffering from a mental disorder on or around July 9, 1966, from which he has now recovered, and that the alleged crime, if committed by him, was the product of his illness. He is not receiving medication.

On February 3, 1967, four days after his release, the West Side Division Clinical Director of the Hospital wrote a letter to Mrs. Morgan as follows:

This is to inform you that your husband, Mr. Joseph Morgan, was officially discharged from St. Elizabeths Hospital on January 30, 1967.

We trust he will make a good adjustment in the community.

At trial of the present case a daughter of Mrs. Morgan testified that on January 30, 1967, she had received a phone call from, she thinks, the clerk at the court. He asked if Corinne Morgan was at home, was told she was not, that she was at work, that it was her daughter talking, and he then said, "Well, didn't she know that she was supposed to be in court this morning?" She testified that upon learning her father was released that day she was so upset she ran across the street to her mother's best girlfriend and asked what should she do. They decided to call her mother because she (Mrs. Morgan) had been saying that she wanted to be away and hoped she could move before he got out. They called her mother (who apparently was approaching the house) from the friend's window and broke the news to her that he had been released. Mrs. Morgan was very upset.

Two days after his release, on February 1, Morgan was arrested for intoxication. On the 3rd of February he was committed by the Court of General Sessions to the Alcoholic Unit at Occoquan, Virginia. On February 23rd the court released him to the Director of the Clinic for outpatient treatment. On March 26, 1967, when he came to the family home [5] his wife told him he could not stay. He then shot and thus killed her.

He was indicted for second-degree murder and assault with a dangerous weapon on May 23, 1967. Following his commitment to the Hospital he was found incompetent to stand trial on August 26, 1967. On August 25, 1967, his Clinical Record there shows his condition to have been diagnosed as "Chronic Brain Syndrome, Associated with Alcohol Intoxication . . . ." The opinion recorded that this "Chronic Brain Syn-

---

5. He came home the day of his release and got his clothes, and returned for a time the day before the homicide.

drome existed on or about March 26, 1967" [the date of the homicide] and the homicide "was a product of that illness."

On September 23, 1968, he was acquitted of the murder at an uncontested trial before a judge who found him not guilty by reason of insanity. A staff doctor of the Hospital testified on this occasion that he and another doctor, as the result of a conference August 25, 1967, had concluded that Morgan had been suffering from chronic brain syndrome on March 26, 1967, when he killed his wife.

During this civil action trial there was admitted in evidence a transcript of the staff doctor's testimony during the homicide trial. This included a reference to a psychological summary made by another doctor at the Hospital in July, 1967, which appellees' counsel read as follows [apparently summarizing the most relevant substance of the summary]:

> "Previous testing: Mr. Morgan was tested in October 1966 and again in July of 1967. The test data reflected a deteriorative process consistent with the effects of prolonged alcoholism in an already profoundly inadequate individual. The most severe deterioration was in the area of emotional controls. There was an unusual ineptness in handling hostile feelings. Additional relevant findings will be incorporated in the report below. For a fuller discussion, see the previous reports."

Counsel then interposed:

> And for the record, the only previous psychological report was the one in October of 1966. (This was the report of Dr. Borriello.)

The examination of the staff doctor at the homicide trial then resumed as follows:

> "QUESTION: Do you agree with that statement in your appraisal of the relationship of Mr. Morgan's condition to the offense against his wife?
>
> "ANSWER: Yes, that was our finding at the staff conference."

Dr. Borriello's statement of October 25, 1966, noted *supra*, had included the following:

Outstanding in the test results is organic brain damage due to the effects of a long history of alcohol consumption.

As we have stated, the District Court concluded that the Hospital was negligent in not more fully advising the court as to Morgan's mental condition and that the negligence of the Hospital was in its failure to transmit adequate information to the court concerning that condition. Finding also that the Hospital's negligence was a proximate cause of the death of Mrs. Morgan, the court awarded judgment against the United States in favor of appellees.

## II

### A QUESTION OF JURISDICTION

■ The United States on appeal advances for the first time the position that the District Court lacked jurisdiction by reason of section 2680(h) of the Federal Tort Claims Act which excepts from its coverage "any claim arising out of . . . misrepresentation . .." The theory is that appellees base their claim upon a negligent misrepresentation, and that section 2680(h) excludes such a claim under the decision of United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). It is not clear that appellant's reliance upon section 2680(h) poses a jurisdictional issue or only an issue of fact concerning application of the Act. If the latter, it need not be considered, for it was not raised or litigated in the District Court.

That aside, we consider the contention not well founded. The trial court found liability because of the negligence of an agent of the United States in fulfilling an obligation grounded upon much more than the contents of the Hospital's report to the court. Judge Curran held:

> The hospital has a duty to make a full report to the court and the report rendered violated the hospital duty if there was knowledge of an underlying chronic condition. The negligent failure to disclose pertinent information has been well established as a violation of medical duty. (Footnote omitted.)

*Hicks, supra,* 357 F.Supp. at 438. Again:

> The psychiatrists at St. Elizabeths Hospital should realize that in submitting a competency report, they should include all information relative to the defendant's mental condition in order that the judge may make a proper determination.

*Id.* at 440. Moreover, the decision of the court states:

> This Court finds that the United States of America through St. Elizabeths Hospital negligently made a competency report . . ..

*Id.*

■ These bases of the decision contain the answer we must give to the contention that the case rests upon a negligent misrepresentation. The letter to the court—the asserted representation—manifests as we shall see not only its own contents but, in the context of the evidence, manifests also a negligent omission of information essential to fulfillment of the duty of the Hospital.

The complaint is not based upon injury to appellees or to Mrs. Morgan, through whom they claim, due to a negligent misrepresentation to them which they relied upon to their injury. Compare *Neustadt, supra.* Moreover, to interpret what occurred as proving only a negligent diagnostic misrepresentation, rather than proof of negligent performance by the Hospital of a public responsibility with respect to the discharge of the patient to the court, would inaccurately describe the basis for the claim. Involved is the alleged lack of care required of a branch of the government in carrying out a responsibility, leading, allegedly, to injury to private persons. The Tort Claims Act was enacted to afford a remedy if such a case is proven. Section 2680(h) does not in our view grant an exception to a tortious failure of an agency of the United States to perform a duty imposed upon it by law, though proof of such failure rests in part upon a representation to a court in response to the agency's duty to the court.[6]

6. The cases primarily relied upon by the United States touching upon misrepresentation are: Matthews v. United States, 456 F.2d 395 (5th Cir. 1972); De Lange v. United States, 372 F.2d 134 (9th Cir. 1967); Beech v. United States, 345 F.2d 872 (5th Cir. 1965); and Hungerford v. United States, 307 F.2d 99 (9th Cir. 1962). These are now briefly reviewed. *Matthews* involved a claim by the wife of an Air Force officer injured in a collision of an automobile with a United States Army vehicle. The plaintiff and her husband sought the legal advice and assistance of Air Force personnel in connection with their claim for the injuries. The advice given was that the wife had done all she was required to do to protect her claim. In fact this was not correct. In the suit under the Tort Claims Act, the Court of Appeals said by way of dicta in reversing the dismissal of the complaint by the District Court, "[t]he medical malpractice cases hold that a communicated diagnosis, with nothing more, is within the § 2680(h) exception . . ." 456 F.2d at 398, citing in a footnote De Lange v. United States, *supra,* for the position that when a physician is under a duty to proceed further and treat a patient section 2680(h) does not apply. *De Lange* is a brief per curiam opinion stating:

> We affirm the judgment below; holding that the communicated diagnosis was a representation. (Hall v. United States, 274 F.2d 69 (10th Cir. 1959).) An incorrect representation is "misrepresentation" with-

in the meaning of the statute (28 U.S.C.A. §§ 2674 and 2680(h) ) . . . [citing *Neustadt* and referring to *Hungerford.*] 372 F.2d at 134. In *Beech* summary judgment had been granted by the District Court against a complaint alleging injury due to the negligence of an Army Hospital. In reversing and remanding the Court of Appeals said:

> . . . the Government had not only the duty to communicate to [the injured party] a diagnosis of her condition, but also to render proper care for her treatment. Under the allegations of the complaint there was a failure to perform this latter duty and such a failure is not covered by the 2680(h) exception. Hungerford v. United States (9 Cir., 1962), 307 F.2d 99.

345 F.2d at 874. In *Hungerford* it is stated that a communicated diagnosis of physical condition is a misrepresentation, citing Hall v. United States, *supra,* but held that,

> . . . where the Government, on the basis of facts which it is chargeable with ascertaining by a proper examination, has a duty to perform in addition to the duty of disclosing those facts, negligence in the conduct of such examination which results in a failure to perform the additional duty is not covered by the § 2680(h) exception.

307 F.2d at 103. The case turned on the allegation of failure to perform a duty of care with respect to an examination and diagnosis of the plaintiff's condition, and diagnostic tests, or because of failure to make tests

## III

## THE QUESTION OF NEGLIGENCE

1. By reason of its nature as a public institution St. Elizabeths Hospital owes a duty to the public in carrying out its difficult responsibilities. We have no occasion now to decide, however, whether its public duty included an entirely separate duty to Mrs. Morgan. There was a particular duty to the Court of General Sessions, and in the circumstances of this case it was intertwined with a duty to her. See *infra,* note 12.

■■■ As to the Hospital's responsibility to the Court of General Sessions, considered in the context of a claim by private parties that the Hospital has been negligent in discharging a patient alleged to be suffering from a mental disease, the judiciary must recognize the difficulties confronting the Hospital. Generalizations must be avoided as much as possible in the area of psychiatry. Negligence cannot be imputed to the Hospital merely because of a mistake. A claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them. Exactitude is often impossible. The Supreme Court has recently noted " 'the uncertainty of diagnosis in this field and the tentativeness of professional judgment.' Greenwood v. United States, 350 U.S. 366, 375, 76 S.Ct. 410, 100 L.Ed. 412 (1956)." Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (February 19, 1975). Error and uncertainty considered alone must often be accepted without labeling them negli-

gence. Yet we cannot accept the position of the United States which would confine the legal responsibility of the Hospital in this case to a narrow reading of section 24–301(b) of our Code. Pointing to Mr. Morgan's commitment to the Hospital August 12, 1966, "until he is mentally competent to stand trial" (Tr. II, 33), the United States relies upon section 301 as confining the Hospital's legal responsibility. The section provides:

> Whenever an accused person confined to a hospital for the mentally ill is restored to mental competency in the opinion of the superintendent of said hospital, the superintendent shall certify such fact to the clerk of the court in which the indictment, information, or charge against the accused is pending and such certification shall be sufficient to authorize the court to enter an order thereon adjudicating him to be competent to stand trial, . . . unless the accused or the Government objects, in which event, the court, after hearing without a jury, shall make a judicial determination of the competency of the accused to stand trial . . . .

24 D.C.Code § 301(b).

This court has held that the duty of the Hospital under section 301 calls for a report in substantial detail going beyond a bare conclusion as to competency to be tried.[7] We shall enlarge upon this subject shortly but now refer to a particular aspect of the report to the court in this case. The report about Mr. Morgan went beyond a certification of his competency to be tried. It advised the court, unquali-

which in the exercise of proper medical care should have been made. The exception was not applied. In *Hall, supra,* the representation held to come within the exception had resulted from alleged negligent testing of livestock for a disease. It had been incorrectly represented to claimant that some of the cattle were diseased, which led him to sell the cattle to his loss. The court applied the section 2680(h) exception.

**7.** In Washington v. United States, 390 F.2d 444, 453, n.25 (D.C.Cir. 1967), we pointed out:

The Judicial Conference of the District of Columbia has condemned the use of con-

clusory labels in hospital competency reports. In October 1965, the Conference recommended that "The report of a court-ordered pretrial mental examination should be made in substantial detail, recounting what was done to get at the facts concerning the accused's mental condition and what those facts are, not merely the conclusions the psychiatrists have drawn from these facts."

The Superintendent of St. Elizabeths at the time of the trial of this case said he was aware that this was necessary.

fiedly, that he was "recovered." Thus, the issue of negligence confronted the District Court, apart from whether or not the legal responsibility of the Hospital under section 301 was to report only as to Mr. Morgan's competency to be tried.

We are cited to no case claiming damages due to injury resulting from a hospital's negligence in connection with its obligation to a court regarding the mental condition of one who has been committed to the hospital for determination of his competency to be tried on a pending charge. There are cases, including our own, which have enunciated standards for determining a hospital's negligence in other circumstances. See, for example, Lucy Webb Hayes National Training School v. Perotti, 136 U.S.App. D.C. 122, 419 F.2d 704 (1969); Washington Hospital Center v. Butler, 127 U.S.App.D.C. 379, 384 F.2d 331 (D.C.Cir. 1967); Underwood v. United States, 356 F.2d 92 (5th Cir. 1966). And numerous cases cited to us have involved problems of actionable negligence of physicians alleged to have led to injury to patients.

■ A very recent case is Tarasoff v. Regents of the University of California, 13 Cal.3d 177, 118 Cal.Rptr. 129, 529 P.2d 553 (1974), rehearing granted March 12, 1975.[8] There is also the recent case of Homere v. State, 361 N.Y.S.2d 820 (1974). The Court of Claims of New York there approved the rule that a hospital is not liable under the state tort claims act for "an honest error of professional judgment", *Id.* at 823; but the court held the state was liable for injuries inflicted on two persons by a psychiatric patient whose release from a state hospital was due to the negligent failure of the hospital to reconvene, in the special circumstances of the case, including a history of violence, a three-psychiatrist "commission" to reevaluate the patient's condition before his release. *Id.* at 824.

■ The basic standard to govern our decision on the issue of negligence is well-settled, and may be stated as requiring "that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances." Washington Hospital Center v. Butler, *supra,* 384 F.2d at 335.[9] And see, Tarasoff v. Regents of the University of California, *supra.*

Fair v. United States, 234 F.2d 288 (5th Cir. 1956), involved liability under the Tort Claims Act for alleged negligence in the release of an Air Force officer from a base hospital which resulted in three homicides. The court, in reversing the dismissal of the complaint, referred to the applicable standard as stated by the Supreme Court in Schulz v. Pennsylvania Railroad Co., 350 U.S. 523, 525, 76 S.Ct. 608, 100 L.Ed. 668 (1956):

"In considering the scope of the issues entrusted to juries in cases like this, it must be borne in mind that negligence cannot be established by direct, precise evidence such as can be used to show that a piece of ground is or is not an acre. Surveyors can measure an acre. But measuring negligence is different. The definitions of negligence are not definitions at all, strictly speaking. Usually one discussing the subject will say that negli-

---

8. When a "hospital has notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself *or others* unless preclusive measures were taken, then the hospital must use reasonable care in the circumstances to prevent such harm." (Vistica v. Presbyterian Hospital (1967), 67 Cal.2d 465, 469, 62 Cal.Rptr. 577, 580, 432 P.2d 193, 196.) (Emphasis added.) A mental hospital may be liable if it negligently permits the escape or release of a dangerous patient (Underwood v. United States (5th Cir. 1966), 356 F.2d 92; Fair v. United States (5th Cir. 1956), 234 F.2d 288). 118 Cal.Rptr. at 134, 529 P.2d at 558, n.8.

9. Our present case was not tried on the theory that negligence is to be determined on the basis of expert opinion as to reasonable prudence, *see,* Lucy Webb Hayes National Training School v. Perotti, *supra,* 419 F.2d at 710–711; Washington Hospital Center v. Butler, *supra,* 384 F.2d at 336.

gence consists of doing that which a person of reasonable prudence would not have done, or of failing to do that which a person of reasonable prudence would have done under like circumstances. Issues of negligence, therefore, call for the exercise of common sense and sound judgment under the circumstances of particular cases."
234 F.2d at 295.

The standard to be applied, however, must take into consideration the uncertainty which accompanies psychiatric analysis. In that area, as we have suggested, negligence may not ordinarily be found short of serious error or mistake, and not necessarily when the error or mistake is serious. The concept of "due care" in appraising psychiatric problems, assuming proper procedures are followed, must take account of the difficulty often inevitable in definitive diagnosis. Nevertheless, applying the standard we have indicated as applicable, we approve the District Court's finding of negligence, as we shall more fully explain. To hold otherwise in light of the certainty of the Hospital's advice to the court that Morgan had recovered, would run counter to that degree of uncertainty, to which we have referred, in psychiatric evaluation and analysis.

2. On the basis of the record reviewed as above to the extent deemed requisite for passing upon the issue, Judge Curran found negligence in the Hospital's "failure to transmit adequate information to the court concerning the patient's mental condition." 357 F.Supp. at 439.[10]

The evidence at trial demonstrated that the Hospital knew that Morgan had been found by the District of Columbia General Hospital to suffer from a "moderately severe organic brain syndrome", "actual brain damage". There was also testimony of a doctor at the Hospital, pointed to by Judge Curran, that the Hospital's own findings did not really differ from the advice given to the court by the District of Columbia General Hospital.

The Hospital's Clinical Record entries of October 21, 1966, had stated: "[P]atient's family can definitely not be used as a community resource as they are afraid of him." The psychological tests of Morgan reported in the October 25, 1966, "Psychological Summary", as we have noted, contained a conclusion, under the label "General Impression", that outstanding in the results of the test "is organic brain damage. . ." The Psychiatric Case Study of October 26, 1966, records, "patient's wife called the police . . . [Morgan] had threatened to kill her . . . the eighth time . . . arrested for similar reasons." The October 27, 1966, report referred to the psychological tests as follows:

Psychological testing revealed marked evidence of organicity . . . .

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

. . . Those who know him best feel that he is ready soon to return to Court for trial.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Acute Brain Syndrome Associated with Alcoholic Intoxication.
(Recovered).
. . . Mentally competent to stand trial.

\*   \*   \*   \*   \*   \*

Condition on
Discharge:      Recovered.

---

10. Additional rulings of the judge respecting negligence are set forth, *supra,* 167 U.S.App.D.C. p.——, 511 F.2d p. 413.

Soon thereafter, on December 19, 1966, the Hospital reported to the Court of General Sessions the opinion of the physicians,

> that Mr. Morgan has recovered from his mental disorder, Acute Brain Syndrome Associated With Alcohol Intoxication. . . . [t]here is indication that he was suffering from a mental disorder on or around July 9, 1966, [the date of the assault was July 7] from which he has now recovered. . . . "

For the full text of this report see, 167 U.S.App.D.C. p. ——, 511 F.2d p. 412, *supra*.

Upon Morgan's release January 30, 1967, followed by the homicide on March 26, 1967, in turn followed by the indictment and commitment to St. Elizabeths, this time by the District Court, ample evidence accumulated to give support to the District Court's finding on the whole evidence that the Hospital's report to the court had been so inadequate as to justify characterizing it as negligent. Any doubt that the standard of care appropriate to the circumstances was not met is removed by testimony growing out of the recommitment of Morgan to the Hospital after he had killed his wife, as he had threatened to do. The United States urges, however, that this later change in the position of the doctors was due to a change in Morgan's condition rather than that the chronic condition had existed when the letter that he had recovered was sent to the court under date of December 19, 1966. But the trial court on all the evidence reasonably concluded otherwise. The evidence supports the court's conclusion that the chronic

condition the doctors later agreed upon, as represented by their testimony after the homicide, reflected Morgan's actual condition at the earlier period. Moreover, the testimony at trial that the psychological tests, referred to in the October 25 report, which showed organic brain damage due to the effects of a long history of alcohol consumption, could refer to either an acute or a chronic condition, the former being the way it was described by the Hospital to the Court of General Sessions, does not persuade us that the report was informative enough to avoid considering it to be the consequence of negligence. It gave no indication whatever of uncertainty as to his condition, justified by the Hospital record, or the danger to his wife should he be released.

The trial court was not required in finding negligence to go so far as to find, as it did, that the Hospital knew of the underlying chronic condition. It is sufficient that in the exercise of due care in the circumstances it should at least have indicated uncertainty. The inadequacy of the report appears also from its complete omission to inform the court with greater detail of his mental condition as a basis for guidance to the court, including some reference to the special orientation of his condition toward danger to his wife should he be released.[11] The evidence in sum called for something more than a definite characterization of his condition as having been only acute, and recovered. At trial the doctor who in the interim had become Superintendent of the Hospital testified that when the report to the court in December, 1966, that he had recovered

---

11. The allegations made by Mrs. Morgan in her affidavit are referred to several times in the Hospital record. Her statement reads:

> Husband came home after drinking and assaulted me by kicking me in the back choked me and beating me in head with fists. I managed to escape him from the house and he stated "get you black ass out of here" and if I came back he would "murder" me and if he finds me anywhere he'll kill me on the spot. He has been acting this way for the past five or six months and has got to the point where he

> drinks constantly and has not worked for the past week. I have nine children the oldest is 19 and youngest four and he uses foul language in front of them constantly. I have been in fear to return home ever since Thursday and have been living with friends. I was here in the U. S. Attorney's office last week and have been here in past months. I have had him arrested before for drunkeness and fighting before.

We have outlined heretofore in this opinion the continuity of his attitude toward and threats to his wife while at St. Elizabeths.

was made, if Morgan had continued to suffer from a brain injury and the Hospital knew he posed a danger to his wife, it surely should have been in the report. He felt, however, that the report was adequate on competency since it advised the court of the basis for that finding, quite a different matter.

There can be no serious question, in our analysis of the situation, that the Hospital was advising the court, for its use and the use of those officials responsible for participating in the proceedings, that his stay at the Hospital was no longer desirable from any standpoint— he was discharged by the Hospital as recovered. There was no indication that, being competent to stand trial, there was any other matter to be considered with respect to his mental condition. The report thus went beyond a report on competency to stand trial.

The earlier report to the court by the District of Columbia General Hospital, which became part of the records of St. Elizabeths reflected the connection between his abusive treatment of Mrs. Morgan and his mental condition. And we have referred to the testimony regarding a family visit to Mr. Morgan at St. Elizabeths, which disclosed his continued threats to his wife and her fear for herself should he be released. The numerous Hospital records accumulated during his months there make clear the relationship between his long, excessive use of alcohol and his mental condition associated with his threats and physical abuse of his wife. There was thus imposed upon the institution a duty to carry out its public responsibility so as to reflect these circumstances.[12]

We have referred several times to the statement in the report of the Hospital to the Court of General Sessions that Mr. Morgan was recovered, and we have related that statement to the issue of negligence. We desire to emphasize, however, that our position on that issue does not depend upon the communication of that particular conclusion to the court. The shortcomings of the Hospital resided also in its failure to inform the court fully enough to enable it to pass intelligently upon whatever conclusion the Hospital might have reached. Even had the Hospital advised the court only that Mr. Morgan was competent to be tried, acceptance by the court of that conclusion would have led to the same consequences, hereinafter described in Part IV, as followed from the report submitted. The information in possession of the Hospital about Mr. Morgan's condition imposed upon it an obligation, in reporting to the court on his competency, to communicate a review of that information, including reference to his dangerousness to others, particularly his wife. The obligation so to do arose from the important function of the Hospital to aid the court and the prosecutorial officers in arriving at a course of action on their part protective of society.

A jury would have been justified in finding negligence. Though such a finding by a judge as trier of the facts, as here, may not be equated altogether

---

12. The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. It is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.

There is little analysis of the problem of duty in the courts. Frequently it is dealt with in terms of what is called "proximate cause," usually with resulting confusion. In such cases, the question of what is "proximate" and that of duty are fundamentally the same: whether the interests of the plaintiff are to be protected against the particular invasion by the defendant's conduct. (Footnotes omitted.)
Prosser, Law of Torts, ch. 9, pp. 325–26 (4th ed. 1971).

with that of a jury, it is entitled to weight at our hands. Our consideration of the record leads us to no different conclusion.

The trial judge also found negligence in the failure of the Hospital to follow its own standards of care concerning the diagnosis of the patient. In light of what we have held, it is not necessary to consider this aspect of the case.

## IV

## THE QUESTION OF PROXIMATE CAUSE

■ Liability for compensation for injury alleged to have been caused by negligence follows only if it is proven that the negligence was a proximate cause of the injury. An intervening cause which is independent of the negligence absolves the defending negligent actor of liability. The standard to guide the fact-finder is no stricter now than when stated by the Supreme Court in Milwaukee and St. Paul Railway Co. v. Kellogg, 94 U.S. 469, 474–75, 24 L.Ed. 256 (1896):

> The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft-cited case of the squib thrown in the marketplace. 2 Bl.Rep. 892. The question always is, Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held, that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.

Of special relevance to an aspect of our case is the Restatement of Torts, § 448 (1965), p. 480:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

See Underwood v. United States, 356 F.2d 92, 99 (5th Cir. 1966) as an application of this position.

■ Moreover,

> . . . where it is evident that the influence of the actor's negligence is still a substantial factor, mere lapse of time, no matter how long, is not sufficient to prevent it from being the legal cause of the other's harm.

Restatement of Torts, § 433, comment on Clause (c) at p. 434 (1965).

■ Nor is liability avoided because a causative negligence may concur with another of like character.

> The rule is settled by innumerable authorities that if injury be caused by the concurring negligence of the defendant and a third person, the defendant is liable to the same extent as though it had been caused by his negligence alone.

Miller v. Union Pacific R. Co., 290 U.S. 227, 236, 54 S.Ct. 172, 174, 78 L.Ed. 285 (1933).

> Injury consequent upon the concurring negligence of two or more persons subjects each to liability. . .
> "It is no defense for a wrongdoer that a third party shared the guilt of the same wrongful act, nor can he escape liability for the damages he has caused on the ground that the wrongful act of a third party contributed to the injury." Miller v. Union Pac. R.R., 290 U.S. 227, 236, 54 S.Ct. 172, 174, 78 L.Ed. 285 (1933). . . .

Washington Hospital Center v. Butler, *supra,* 384 F.2d at 339 n. 29. And see, Hanna v. Fletcher, 97 U.S.App.D.C. 310, 231 F.2d 469 (1956), cert. denied, sub nom. Gichner Iron Works, Inc. v. Hanna, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956), with its special discussion also as to the responsibility of the jury in determining proximate cause.

What we have said in Part III goes a way to indicate our answer to the question of proximate cause. Mr. Morgan's release upon entry of the nolle prosequi was a natural consequence of the position of the Hospital conveyed to the court. That position contained no information which might have led the court to follow a course other than release. None of the factors in his history known to the Hospital, indicative of a possibly chronic or other unstable mental condition was suggested to the court. No mention was made of the close connection between his brain syndrome, his excessive use of alcohol, and his threats to kill his wife.

The unqualified report that Morgan was recovered is shown by the evidence as a whole to have been seriously mistaken, and to have resulted from a lack of the care required of the Hospital. A careful appraisal communicated to the court, though it included the opinion that Morgan was competent to be tried, would not have stated unqualifiedly that he had recovered; it would have embodied a significantly fuller account of his condition, with some reference to the connection between his condition and the danger to his wife if he were at liberty. The absence of a report of this or comparable character must be considered to have been a substantial factor leading to his release. The effect was to close the door as it were to steps by either, or both, court and prosecution looking to his return to the Hospital as incompetent to stand trial, or for further observation and treatment, or leading either, or both, court and prosecution to initiate steps toward civil commitment. Had an adequate report been formulated based on his history known to the Hospital the institution itself no doubt would not have discharged him as recovered, even though competent to stand trial. It would have awaited consideration of the situation by the court. Certainty that any one or more of the courses we have mentioned would have been followed is not required to be established in order to find against the Hospital on negligence as a cause of the release of Mr. Morgan. As this court held in Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825 (1941), on an issue of proximate cause related to injury allegedly due to negligence in radiation treatment by a hospital,

> there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion. The law is not so exacting that it requires proof of negligence or causation by testimony so clear that it excludes every other speculative theory. (Footnotes omitted.)

*Id.* at 840.

We accordingly accept as adequately supported by the evidence the conclusion of the District Court that the negligence of the Hospital was a substantial factor which contributed to the release of Mr. Morgan, as part of the continuing course of events which link the negligence of the Hospital to the death of Mrs. Morgan as a proximate cause of it.

The consequences of the release, as they developed, were foreseeable. Mor-

gan promptly resumed his drinking. This triggered the pattern of the past, ending now fatally for his wife.[13] The homicide of course was a wrongful act intervening between his release and the death, but the fact that he would again attack his wife was foreseeable, even that he might do so with fatal consequences. The homicide was closely related to the very reason he had been committed originally to the Hospital—one of many drunken assaults upon his wife. The brain syndrome from which he suffered, due to his heavy drinking for many years, had been accompanied by recurring physical assaults upon her, not free of threats to her life. These were known manifestations of the mental condition which brought him to the Hospital. His release led to drink which activated the brain damage from which he suffered. The homicide was the consequence, or so in reason could it be found. The tragic culmination did not occur for 56 days after his release, during 20 days of which, however, he was in confinement or under public care because of his alcoholic affliction, which was a part of the foreseeable pattern. The lapse of time is of no controlling legal significance. It introduced no foreign or unforeseeable factor as an unrelated and independent cause of the tragedy, for the Hospital "at the time of [its] negligent conduct realized or should have realized the likelihood that such a situation might be created . . . ," with the result which followed. Restatement of Torts, § 448, *supra.* That the result was fatal to his wife did not break the chain of causation.

Affirmed.

TAMM, Circuit Judge, concurring with whom McGOWAN, Circuit Judge, joins:

I concur in Judge Fahy's well reasoned opinion. Specifically, I agree that since proximate causation is a question of fact, the scope of our review is limited to determining whether the trial judge's finding of proximate causation was clearly erroneous. I believe that Judge Fahy amply demonstrates that Judge Curran's finding was not clearly erroneous. I also agree that under the statutory scheme St. Elizabeth's Hospital owes a duty to the courts to disclose information in its possession that would undermine or cast doubt on its diagnosis, as well as to divulge facts consonant with that diagnosis. However, in considering Judge Fahy's opinion, I became concerned with the relationship between the hospital's obligation of disclosure and its duty of reasonable care in making its diagnosis. I therefore take this opportunity to set forth what I believe to be the relationship between the two, and how their interaction affects the hospital's liability.

It is obvious that the courts cannot make informed judgments concerning the necessity or desirability of civil commitment proceedings without the expert guidance of the staff of institutions such as St. Elizabeth's. Nevertheless, the commitment decision is a legal, rather than a medical, one; the court must convert medical findings and opinions into legal conclusions having the profoundest effect on an individual's liberty. The court cannot intelligently fulfill its responsibility unless it knows of facts that are dissonant to the hospital's diagnosis as well as those facts that are consonant to it.

While this duty is owed to the courts, appellees are logical persons to enforce it. Unless persons injured by the hospital's failure to properly perform its functions can recover for their injury, society's ability to insure that the hospital conscientiously performs its duties is rendered haphazard at best.

---

**13.** At the uncontested trial for murder a physician on the staff of the Hospital testified that the connection between Mr. Morgan's condition and the murder was pretty clear cut: "It was not merely the fact that he had been drinking, but alcohol, in the case of a brain damaged individual, impairs his judgment and his restraint and his capacity to restrain himself. And all of this had—I think it was pretty clearly related to this condition which I referred to as chronic brain syndrome."

However, private enforcement of the duty of disclosure is not a panacea, for, as I perceive our holding, the potential range of recovery for breach of the hospital's duty of disclosure is narrowly confined. Initially, recovery in the case *sub judice* must be predicated upon the fact that the hospital's diagnosis was incorrect even if it were not negligent. As Judge Curran pointed out: "There is no explanation how Morgan could have become incompetent from his drinking during three weeks of freedom and the subsequent diagnosis of chronic brain syndrome associated with alcohol associated with behavioral reaction." Hicks v. United States, 357 F.Supp. 434, 439 (D.D. C.1973). If the original diagnosis, "acute brain syndrome associated with alcohol—recovered," had been correct, I fail to see how there would be a causal connection between the hospital's conduct and the homicide. Unfortunately, acts of violence are constantly committed for reasons that are not associated with mental dysfunction as we know it, and this case would then fall into this category.

Moreover, the hospital can discharge its obligation, even if its diagnosis is incorrect, by disclosing information in its possession that could reasonably aid the court in carrying out its functions. I do not suggest, nor do I believe that my brethren suggest, that the hospital alter its normal diagnostic procedures out of fear that it will be charged with the failure to disclose information that would have been discovered had the hospital performed further tests. Such problems remain in the realm of the reasonableness of the diagnostic procedures, where the judgments of the institution and its staff must be given great deference. *See* Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). I am certain that the courts in this jurisdiction will be diligent in insuring that issues involving negligence in diagnosis or treatment are not confused with negligent disclosure.

Finally, I agree with Judge Fahy that the trial judge's finding of negligence cannot be set aside. The negligence issue is one that is submitted to the trier of fact and we do not approach the issue *de novo.* On this record, it was reasonable for the trial judge to find that the hospital breached its duty in failing to disclose information of recognized importance.