Virginia E. TEASLEY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 79–1360.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1980.

Decided Dec. 24, 1980.

Charles H. Fleischer, Washington, D. C., with whom Richard S. T. Marsh, Washington, D. C., was on the brief, for appellant.

Ann O'Regan Keary, West Roxbury, Mass., Staff Atty., Office of Legal Advisor, Saint Elizabeths Hospital with whom Carl S. Rauh,* U. S. Atty., John A. Terry, Robert M. Werdig, Jr., and Norman M. Monhait, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before ROBB, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This action began in the District Court pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. The complaint sought damages for personal injuries sustained by the plaintiff Teasley when she was assaulted, robbed, raped and sodomized by one Clarence Neverson. The plaintiff's case was that in prosecuting a petition for judicial hospitalization of Neverson before the District of Columbia Commission on Mental Health and employees and agents of Saint Elizabeths Hospital, an agency of the United States, negligently failed to produce evidence tending to show that Neverson, if not hospitalized, was likely to injure himself or others; and that as a direct result of this negligence Neverson was not judicially hospitalized, but was released, and thereafter committed the offenses against plaintiff. The District Court granted the defendant's motion for summary judgment.

The plaintiff bases her right to recover on *Hicks v. United States*, 167 U.S.App.D.C. 169, 511 F.2d 407 (1975). The District Court held however that the facts of this case distinguish it from *Hicks v. United States*. We agree and affirm.

The record discloses that in 1973 Neverson was charged with committing an indecent act on his minor sister. Pursuant to a court order under 24 D.C.Code § 301(a), for a pretrial competency examination, he was sent to Saint Elizabeths Hospital and confined there from January 22 to February 12, 1973. The hospital having reported that he was competent to stand trial and that the alleged offense was not the product of a mental disease or defect, he was tried, convicted, and sentenced to be imprisoned for not less than 18 months nor more than 54 months. On June 29, 1973, during his incarceration at the Lorton Correctional Complex, he was transferred to Saint Elizabeths Hospital pursuant to an order of the Superior Court of the District of Columbia under 24 D.C.Code § 302, for treatment of his mental illness. This second admission to Saint Elizabeths lasted until October 1973 when Neverson was returned to the custody of the District of Columbia Department of Corrections, pursuant to 24 D.C.Code § 303(b). On December 19, 1975 Neverson, who was still imprisoned at Lorton, was again transferred to Saint Elizabeths under 24 D.C.Code § 302. During this third admission he filed a petition for a writ of habeas corpus in the Superior Court of the District of Columbia and on the basis of this petition the court, holding that his term had expired, ordered him released. This order was entered March 31, 1976. The court stayed the effect of its order for 30 days "to permit the respondents to initiate civil commitment proceedings" pursuant to D.C.Code §§ 21–541 *et seq.*

On April 12, 1976 the Acting Superintendent of Saint Elizabeths Hospital filed in the Superior Court his petition for judicial hospitalization of Neverson, pursuant to D.C.Code § 21–541 *et seq.* The petition recited Neverson's conviction and imprisonment on a charge of taking indecent liberties with a minor child "in Criminal Number 46373–723", and averred that Neverson "is mentally ill and, because of such illness, is likely to injure himself or others if allowed to remain at liberty." The petition

---

* United States Attorney at the time the brief was filed.

was supported by the certificate of Neverson's treating psychiatrist, Dr. Smith, who stated that Neverson "is mentally ill, suffering from Schizophrenia, Paranoid Type, and because of such illness is likely to injure himself . . . or others if allowed to remain at liberty." Amplifying this conclusion Dr. Smith said that Neverson "is irrelevant, irrational, and delusional. He has delusions that he is a billionaire, reincarnated, and has gotten a lot of people off welfare. He feels he is boss, has a lot of people working with him to get rid of the evil demons of our world, namely, the Jews. His delusions are all grandiose, and not persecutory. He does not believe that he is being persecuted in any way because he believes that he is a 'man', and as such, he is too powerful for any one to hurt." In accordance with 21 D.C.Code § 541 the Hospital's petition was referred to the District of Columbia Commission on Mental Health.

On April 26, 1976 the Commission conducted a hearing in Neverson's case. The Hospital's witness supporting the petition at the hearing was Dr. Robert O. Randle, Jr., a licensed clinical psychologist, who was the Clinical Administrator of the ward in which Neverson had been confined during both his admissions from Lorton. Dr. Randle brought with him Neverson's hospital records, which he made available to the Commission, with the exception of correspondence to and from third parties and other agencies.

In answer to questions posed by the Commission, Dr. Randle described Neverson's mental condition upon admission to Saint Elizabeths in December 1975:

[H]e was quite agitated in terms of his behavior. . . . He seemed at the time to be responding to voices . . . had flight of ideas, and shortly thereafter had to be placed on IM [intra-muscular injections of] Thorazine so that his agitation could be . . . take [sic] care of in some appropriate manner.

Dr. Randle went on to note that Neverson had made some progress during his hospitalization, but he cautioned:

*I think the main reason for that [progress] has been the medication that he is receiving.* He is on a combination of drugs, Thorazine 300 milligrams g.i.d., Stelazine 5 milligrams t. i. d. and Kemadrin 5 milligrams b. i. d. [Emphasis supplied]

Dr. Randle also said that Neverson still believed himself to be "the last of the big time spenders" and mentioned that there was a reference in the records to his being "the last of the cold-blooded killers". When asked about Neverson's "insight and judgment", Dr. Randle replied that they were "very poor". The doctor explained:

I don't believe that Mr. Neverson thinks that he has a problem. *If there is anything that could effect* [sic] *him on the outside it could present a difficulty for him.* He also does not believe that he is ill. *Nor does he wish to take medication.* As he has told you, he thinks it makes him put on weight, it doesn't help him, *why should he take it if he is not ill.* [Emphasis supplied]

After noting that Neverson had not been a behavioral problem and had not been involved in any altercations during this period of hospitalization, Dr. Randle acknowledged that he could not say that Neverson was dangerous "at this moment," but he did not believe Neverson could "maintain an adjustment in the streets".

Questioned specifically as to whether Neverson was dangerous Dr. Randle said:

*He would not constitute a danger, I believe, if he remained on his medication. However, if he were to stop taking it altogether I have no idea whether or not he would be dangerous.* My belief is that he would be more dangerous to himself than he would be to other people. [Emphasis supplied]

Expanding on this thought the doctor testified

The consideration I had in my mind was given some of the statements that were made, particularly in terms of sexual content, Mr. Neverson entered this building in December, and given the idea of his charge even though Mr. Fulton [Never-

son's counsel] did point out in fact that we did examine Mr. Neverson and found that there was no productive relationship between his charge and mental illness, I feel that we ought to consider that and *if in fact he was no longer on medication would he act out against someone, particularly a woman* or would he get himself into a situation—he can be kind of verbally provocative and are people going to understand that? We on the ward I think are able to observe that and talk to Mr. Neverson and deal with those kinds of things, sure, where other people might not be able to do that. [Emphasis supplied]

Neverson's mother testified that she believed her son was well enough to return home, that he was not a danger, and that she was willing to have him return to live with her. The Commission then heard briefly from Neverson's brother, and finally from Neverson himself, who testified that he did not think he was sick, nor did he feel that he had been sick at all.

When the possibility of Neverson's return to his home was discussed, Dr. Randle pointed out that Neverson had committed an indecent act on his minor sister. Speaking to Neverson, the doctor said:

I had a question of some material I had noticed when I was perusing the charts that had to do with one of Mr. Neverson's charges in 1969, I think, which had to do with indecent liberties with a minor child. According to the records that we have available to us, didn't that involve one of your sisters?

Neverson agreed that his sister was involved. Dr. Randle continued:

I do have a question about—Do you think you could handle that at home? That was one of the considerations I had.

After a discussion between Neverson's attorney, who objected to Dr. Randle's questions, and the Chairman of the Commission, Dr. Randle continued:

It was just a concern that I had if Mr. Neverson is home. *I believe it is quite important for him to continue taking his medication, and since one of the charges that have arisen for him involved his sister and since he is going home—I don't know whether that sister is at home. . . .* [Emphasis supplied]

When Neverson's mother said the sister was at home, Dr. Randle added, "Is that going to work out for you all? That is a concern I have." Further discussion of this issue was foreclosed when Neverson's attorney objected again, arguing that Neverson had been tried and convicted of the offense against his sister, had been "found not to be productive", and had paid his debt to society. Finally, counsel argued that Neverson did not meet the commitment criteria and he asked the Commission to dismiss the petition. He pointed out that Neverson would be under parole supervision, and that the community would therefore have a "hold over him . . . if he tends to recidivate." [sic]

The Commission on Mental Health found that Neverson although mentally ill was not dangerous to himself or others, and recommended that the petition for judicial hospitalization be dismissed. On April 28, 1976 the Superior Court dismissed the petition and Neverson was released from Saint Elizabeths. On May 16, 1976 he assaulted, robbed, raped and sodomized the plaintiff in the locker room of the George Washington University Hospital where she was employed. On May 24, 1977 he was found not guilty of these offenses by reason of insanity and committed to Saint Elizabeths Hospital where he remains as a patient.

Neverson's police record as an adult reflects that in 1971, when he was twenty-one years old, he was arrested in Virginia on a charge of breaking and entering. Apparently the charge was reduced to one of "interfering with the rights of another" and Neverson was sentenced to imprisonment for twelve months and fined approximately $10.00. Also in 1971 he was arrested but not prosecuted for unauthorized use of a vehicle and in 1972 there was a charge of

disorderly conduct which was not prosecuted.[1]

In *Hicks v. United States*, 167 U.S.App. D.C. 169, 511 F.2d 407 (1975), upon which the plaintiff Teasley relies, we held that Saint Elizabeths Hospital was negligent in failing to inform the court in full detail of the mental condition of a patient, one Morgan, who shortly after his release as "recovered" shot and killed his wife. As the district judge in the case before us perceived however, the facts in *Hicks v. United States* plainly distinguish it from the case of the plaintiff Teasley. The Hospital in the *Hicks* case reported to the court that Morgan had recovered from his mental disorder, and the report made no reference to his dangerousness to others, particularly his wife. In fact the Hospital knew that Morgan was suffering from organic brain damage from which recovery was uncertain, and that his wife would be in danger if he were released. As we said in our opinion, 167 U.S.App.D.C. at 184, 511 F.2d at 422 (1975), "The brain syndrome from which he suffered, due to his heavy drinking for many years, had been accompanied by recurring physical assaults upon her, not free of threats to her life. These were known manifestations of the mental condition which brought him to the Hospital."

In the case of Neverson the record shows that the Hospital in its petition for his judicial hospitalization stated that he had been convicted of taking indecent liberties with a minor child and that he "is mentally ill and, because of such illness, is likely to injure himself or others if allowed to remain at liberty." In his testimony before the Mental Health Commission Dr. Randle carefully explained the reasons for the Hospital's conclusion. Although he testified that he could not say that Neverson was dangerous "at this moment", when under the influence of medication, he made it plain that Neverson might be dangerous if medication were discontinued; and he pointed out that Neverson was disposed to stop taking medication. Furthermore, he alerted the Commission to the nature of Neverson's criminal propensity and he suggested from this that it was possible that Neverson would be dangerous to women if released.

The statute, D.C.Code §§ 21–542–544, required the Commission to hold a hearing and make findings on the issue of Neverson's mental illness. The responsibility of decision was thus placed upon the Commission, not upon the Hospital or Dr. Randle. The Hospital was merely the petitioner and Dr. Randle was only a witness. Their duty in those capacities was to disclose to the Commission the material facts known to them which tended to support or negate their conclusions; they were required to make an honest effort, and use reasonable care, to disclose the critical facts as they knew them, subject always of course to the consideration that in the field of mental illness prognosis with certainty is frequently impossible.

From what we have said we think it plain that the Hospital and Dr. Randle fulfilled their duties. They described Neverson as a patient who was mentally ill, who had been convicted of a serious sexual offense, and who might be dangerous to women. They could do no more than alert the Commission to the possibility of danger; there was no basis in the facts for a prediction to a mathematical certainty. Having been alerted to the possibility of danger, the Commission was required to exercise its judgment and decide whether Neverson should be released. The Commission recommended his release. The mistake that was

---

1. A letter dated June 3, 1976 from Walter M. Jarvis, M.D., Staff Psychiatrist Forensic Psychiatry Division, District of Columbia Mental Health Administration, to the Clerk of the Criminal Division of the Superior Court of the District of Columbia stated:

"Mr. Neverson has had at least two prior rape charges, robbery charges as well as charges of an Indecent Act on a Minor."

This letter was written while Neverson was at the District of Columbia jail, after his assault on the plaintiff Teasley May 16, 1976. There is no other documentation of the "two prior rape charges"; if there were such charges they apparently were made when Neverson was a juvenile. Records of the Juvenile Court are confidential. 16 D.C.Code § 2330. Neverson's criminal history was a matter of public record.

made was a mistake of judgment by the Commission, not an error for which the defendant Hospital was responsible. That the plaintiff Teasley suffered from this error is to be deplored, but the defendant cannot be held liable. The judgment of the District Court is

*Affirmed.*