Hazel Morgan **HICKS** et al., Co-Administratrices, Estate of Corine Morgan, Deceased, Plaintiffs,

v.

**UNITED STATES** of America, Defendant.

Civ. A. No. 2357–69.

United States District Court, District of Columbia.

April 19, 1973.

George W. Shadoan, Washington, D. C., for plaintiffs.

Harold H. Titus, Jr., U. S. Atty., Arnold T. Aikens and Derek I. Meier, Asst. U. S. Attys., Washington, D. C., for defendant.

## OPINION

CURRAN, District Judge.

This action is brought by the co-administratrices of the Estate of Corine Morgan, deceased, against the United States of America for the alleged negligence of its agent, St. Elizabeths Hospital, through which Corine Morgan met her death on Easter Sunday, March 26, 1967. The action is brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2671 et seq., and the District of Columbia Survival Statute, 12 D.C.C. § 101, and was tried without a jury.

On July 11, 1966, Corine Morgan made a Complaint that on the previous July 7th Joseph Morgan, her husband assaulted her in their home by kicking, choking and beating her, threatening to "murder" her, and if he found her, he would kill her on the spot; whereupon she fled the home. Joseph Morgan was intoxicated at the time of the alleged assault. He was arrested and committed by the District of Columbia Court of General Sessions to the District of Columbia General Hospital for a mental observation and report. On August 11, 1966, the District of Columbia General Hospital reported to the court as follows:

"This patient was admitted to the Psychiatric Service of this hospital on July 12, 1966.

Upon superficial examining, the patient presents as a friendly, fairly lu-

cid coherent individual. However, psychological tests, which can detect deficiencies in mental functioning not so noticeable in interviews, reveal the patient to be suffering from a moderately severe organic brain syndrome. This condition is due to actual brain damage, and is probably a result of prolonged, excessive drinking. The syndrome is manifested by an impairment of his ability to think, reason, solve problems, handle stress, exercise good judgment, and control impulses. In addition to the above condition, he is functioning at a borderline level of intelligence, and is having emotional, marital problems as well.

The patient denies the alleged offense, and it is difficult for us to evaluate just what was going on at that time, but the alleged offense, if it occurred, would in all probability be considered a product of his mental illness.

It is our opinion that the patient is able to understand the nature of the charge against himself, and despite his impaired mental functioning, probably able to assist counsel in his defense and competent to stand trial.

It is our opinion that the patient's mental impairment is such that he is not yet ready to function in society. This type of brain condition sometimes clears with the passage of time, good diet, and absolute abstinence from alcohol. We therefore think it would be important for him to receive further treatment and hospitalization, and recommend that he be committed to St. Elizabeths Hospital for the same. It is also our recommendation that he be given psychological tests in one month, and then again in six months (whether in the hospital or not) to see if there is any change in his mental condition."

Upon presentation to the District of Columbia Court of General Sessions, Morgan was found to be Incompetent to stand trial and committed to St. Elizabeths Hospital, pursuant to 24 D.C.Code § 301, until mentally competent. This action occurred on August 12, 1966.

On October 25, 1966, psychological tests were administered to the patient and reported as follows:

"*General Impression*:

Outstanding in the test results is organic brain damage due to the effects of a long history of alcohol consumption. Inner resources for the effective and efficient solution of every day problems are lacking. Stressful situations can bring on emotionally labile acting out aggressive behavior. Intellectual functioning rates borderline with a potential once before the present *organic* condition of average.

*Observations*:

Mr. Morgan submitted to the psychological evaluation but his behavior gave indication that he would have preferred not to. He was extremely evasive and cautious in what he said. He used considerable denial when asked questions regarding alcohol consumption and also questions regarding some of the details that he was relating concerning his family, himself and his past experiences.

*Intellectual Functioning*

Present Functioning Level: (WAIS) Full Scale IQ 75

"*Potential*: Average.

Mr. Morgan's present intellectual functioning rates borderline but his potential is estimated to be average based upon his ability to deal with arithmetical problems. He does poorest defining words. Many of his definitions are highly concrete and reflect a combination of cultural and educational deprivation plus the effects of alcohol to the central nervous system. Ability to plan to implement judgment in a social situation also rates defective and suggests that Mr. Morgan would have considerable difficulty living on his own without some guidance and support. The solution behavior with the Block Design subtests was that usually seen in individuals suffering from organic brain

damage due to alcohol. In general though none of the test responses are bizarre.

### Personality Functioning

Protective test materials clearly indicate that Mr. Morgan is lacking in the inner resource capacity to effectively and efficiently solve every day living problems. His thinking is vague, repetitive and he has difficulty shifting in accordance with varying stimuli. Stress results in emotionally labile acting out behavior. He has considerable dependency which he attempts to satisfy through alcohol. Women pose a threat to him and he does not have adequate understanding of his feelings, needs and desires in relation to them. He places insatiable demands upon them that they could never satisfy and which could result in him a violent rage that he could possibly act out.

In general the projective test protocols are confirmatory of the general impression."

The duplicate hospital chart kept on the ward and brought to court by Doctor Klinger had the words, "a violent rage that he could possibly act out", which were underlined, although Doctor Klinger stated he did not do the underlining.

On October 26, 1966, a senior psychiatric resident did a "Psychiatric Case Study" consisting of two typewritten pages, the last two paragraphs of which read:

"On admission he presented as a well-developed, friendly, cooperative, graying, Negro male who looked older than his stated age of 40 years. He was oriented in all three spheres, memory was affected primarily by his massive use of denial around the events of his arrest and around his drinking. Insight was nil. Judgment was moderately impaired and speech was normal. Affect was appropriate. There was no evidence of an underlying psychosis. Physical examination, X-ray and laboratory tests were all within normal limits. Psychological testing re-vealed marked evidence of organicity and personality factors consistent with alcoholism. The Rorschach showed prominent perseveration and he again evidenced the extensive use of denial.

Since his admission here he has resided on Pine Ward, where he got along well with others and seemed to participate in group meetings. He was later transferred to Cedar-Spruce Ward, where his behavior was much the same. On mental examination, there is again no evidence of hallucinations or delusions. He remained oriented in all spheres, showed appropriate affect, and posed a problem only in the assessment of memory loss in the presence of such massive denial. He has a tendency to be impulsive and react quickly when angry."

On October 27, 1966, the same psychiatric resident made a recommended diagnosis, which was approved by the Clinical Division Director, as follows:

"Acute brain syndrome associated with alcohol intoxication. (Recovered)."

and further recommended that he was mentally competent to stand trial and that his condition on discharge was "recovered".

On December 19, 1966, the Superintendent of St. Elizabeths Hospital wrote the Court:

"It is the opinion of the physicians that Mr. Morgan has recovered from his mental disorder, Acute Brain Syndrome Associated with Alcohol Intoxication, and that he is now mentally competent to stand trial in that he has a rational and reasonable understanding of the nature of the charge against him and can properly assist counsel in his defense. These determinations were made on the basis of psychiatric examinations which indicate that there is no evidence of delusions or hallucinations, that he is oriented in all spheres, shows appropriate affect and can discuss the charges rationally. Perception, comprehension

and memory are within normal limits. Intellectual functions are in the borderline range. There is indication that he was suffering from a mental disorder on or around July 9, 1966, from which he has now recovered, and that the alleged crime, if committed by him, was the product of his illness. He is not receiving medication."

On January 30, 1967, Joseph Morgan was discharged by St. Elizabeths Hospital to appear in court for a determination of competency. When Mrs. Morgan did not appear, the court papers reflect that a *Nolle Prosequi* was entered as to the criminal charge.

On February 1, 1967, Joseph Morgan was arrested on a charge of intoxication and on February 23, 1967, he was released from confinement for out-patient alcoholic treatment. On March 26, 1967, he pulled a gun and shot his wife to death.

Upon readmission to St. Elizabeths Hospital, Joseph Morgan was given further psychological tests, interviewed repeatedly by psychiatrists who had completed their training, made the subject of a medical staff conference, and reported to the court on August 26, 1967, as Incompetent to stand trial as a result of a Chronic Brain Syndrome.

On September 23, 1968, after being found Competent to stand trial, Morgan was found Not Guilty of Murder by Reason of Insanity. The trial was uncontested and the only live testimony presented was from Doctor Platkin that Morgan was chronically ill and had been for some time prior to the shooting, and that the murder committed by him less than two months following his discharge from St. Elizabeths on January 30, 1967, was the product of this illness.

At the trial of the instant case, Doctor Klinger testified that the hospital knew Morgan had suffered from organic brain deficits, a chronic brain syndrome, and conceded that nothing in the St. Elizabeths evaluation differed from the findings reported by the District of Columbia General Hospital.

Doctor Carol Jacobs, who was a psychiatric resident during Morgan's first admission and who made the recommendation of diagnosis as "Recovered", testified that the psychological tests were given no consideration.

The competency report of December 19, 1966, stated that Morgan had recovered from the mental condition that produced the criminal charge, which meant that he had completely recovered from the condition described by the District of Columbia General Hospital's report, which had led the court to declare the patient Incompetent.

It appears to the Court that the Hospital knew precisely that the opposite was correct because Doctor Klinger testified in answer to the question, "Is there anything in the D.C.General letter different from your subsequent findings?" Answer, "No, not really". This Court, however, can find no similarity between the two reports.

■ The hospital has a duty to make a full report to the court and the report rendered violated the hospital duty if there was knowledge of an underlying chronic condition. The negligent failure to disclose pertinent information has been well established as a violation of medical duty.[1]

■ That a hospital can be held liable for failing to follow its own standards of care was established in the *Hayes*[2] case, in which the regulations regarding progress notes and the procedures for established diagnosis were admitted to be part of the standard of care which was not satisfied.

1. See Washington Hospital Center v. Butler, 127 U.S.App.D.C. 379, 384 F.2d 331 (1967) ; Lucy Webb Hayes Training School, etc., v. Perotti, 136 U.S.App.D.C. 122, 419 F.2d 704 (1969) ; Underwood v. United States, 356 F.2d 92 (5th Cir.

1966) ; and Merchants National Bank and Trust Company of Fargo v. United States of America, 272 F.Supp. 409 (D. N.D.1967).

2. Infra, note 1.

The defendant takes the position that the plaintiffs' evidence must exclude all other possible causes for the tragedy. However, there are a number of other Tort Claims Act cases in which a released mental patient killed people for which the government was held liable.

In Christie v. Callahan [3] the defendant claimed there was no showing of proximate cause because no positive testimony stated that the radiation treatment caused the necrosis of tissue in question. The court, however, felt differently and said:

> "Circumstantial evidence is sufficient, either alone or in combination with direct evidence. Circumstantial evidence may contradict and overcome direct and positive testimony. The limitation on its use is that the inferences drawn must be reasonable. But there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion. The law is not so exacting that it requires proof of negligence or causation by testimony so clear that it excludes every other speculative theory."

■ In the present case the negligence is the hospital's failure to transmit adequate information to the court concerning the patient's mental condition. (See Washington Hospital Center v. Butler, infra note 1).

■ Injury consequent upon the concurring negligence of two or more persons subjects each to liability.[4] "It is no defense for a wrongdoer that a third party shared the guilt of the same wrongful act, nor can he escape liability for the damages he has caused on the ground that the wrongful act of a third party contributed to the injury." [5]

In Underwood v. United States of America, *supra,* the defense again was that the intervening criminal act broke the chain of causation, but the court said, citing the Restatement of Torts, Section 448, "intervening criminal acts may be found to be foreseeable and, if so found, actionable negligence may be predicated thereon." The court went on to find the negligence proximately connected with the death. See also Cohen v. United States.[6]

The rule stated in Prosser, Torts, (2d Ed. 1955, Section 42) is still a good statement of the law, "The plaintiff is not required to eliminate all other possible causes or inferences; all that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause than that there was not". It is clear that the negligence of the hospital in this case is directly connected with the death of Mrs. Morgan for the negligent failure to communicate what it recognized as the patient's mental condition to the court. Naturally the court acted upon the hospital report that the patient was recovered, for that was the only information that the court had to act upon. It, therefore, contributed to the release that was proximately connected with the death of Mrs. Morgan.

There is no explanation how Morgan could have become incompetent from his drinking during three weeks of freedom and the subsequent diagnosis of chronic brain syndrome associated with alcohol associated with behavioral reaction. In his deposition and at the trial, Doctor

---

3. 75 U.S.App.D.C. 133, 124 F.2d 825 (1941).

4. Danzansky v. Zimbolist, 70 U.S.App.D.C. 234, 235–236, 105 F.2d 457, 458–459 (1939) ; Campbell v. District of Columbia, 64 U.S.App.D.C. 375, 376–377, 78 F.2d 725, 726–727 (1935) ; Metropolitan R.R. v. Jones, 1 U.S.App.D.C. 200, 205 (1893) ; McSparran v. Hanigan, 225 F. Supp. 628, 631–639 (E.D.Pa.1963), aff'd sub nom. McSparran v. Subers, 356 F.2d 983 (3d Cir. 1966) ; Corey v. Havener, 182 Mass. 250, 65 N.E. 69 (1902).

5. Miller v. Union Pac. R. Co., 290 U.S. 227, 236, 54 S.Ct. 172, 174, 78 L.Ed. 285 (1933) ; Choctaw, etc., R. Co. v. Holloway, 114 F. 458 (CCA 8th Cir. 1902) ; Railway v. Cummings, 106 U.S. 700 (1882).

6. 252 F.Supp. 679 (D.Ga.1966).

Klinger admitted that this was the underlying diagnosis which had not been communicated to the court in the first place.

■ The negligent failure of the hospital to record appropriate progress notes or to follow the regulations also constituted a concurring proximate cause for Mrs. Morgan's death. The second admission, which followed only three weeks of freedom in which Morgan could have been drinking, included appropriate progress notes and a medical staff conference which had been omitted during the first admission. Since the second admission resulted in a finding of incompetency due to brain damage caused by alcohol, it is reasonable to conclude that had the proper procedures been followed on the first admission, the conclusion would have been one of incompetency. Had that happened, Morgan would not likely have been determined competent by the court and released. It follows, therefore, that the negligent failure to follow its own standards was also the concurring cause of Mrs. Morgan's death.

■ The psychiatrists at St. Elizabeths Hospital should realize that in submitting a competency report, they should include all information relative to the defendant's mental condition in order that the judge may make a proper determination.

It must be remembered that on August 11, 1966, the District of Columbia General Hospital reported that Morgan was suffering from a moderately severe chronic brain syndrome due to actual brain damage and probably was the result of prolonged excessive drinking. On August 12th a judge of the District of Columbia Court of General Sessions found Morgan incompetent to stand trial and committed him to St. Elizabeths Hospital until mentally competent. On December 19, 1966, the Superintendent of St. Elizabeths Hospital informed the court that Morgan had recovered from his mental disorder of Acute Brain Syndrome Associated with Alcohol Intoxication and was mentally competent to stand trial. It is hard for this court to believe that in such a short time Morgan could become mentally competent to stand trial, especially in view of the testimony of Dr. Platkin at Morgan's trial for murder that he was chronically ill and had been for some time prior to the shooting.

This Court finds that the United States of America through St. Elizabeths Hospital negligently made a competency report concerning the patient, Joseph Morgan, to the District of Columbia Court of General Sessions which was a concurring cause of the patient's release and the subsequent killing of his wife. This Court also finds that the United States of America through St. Elizabeths Hospital negligently failed to follow its own standards of care concerning the diagnosis of the patient, which also was a concurring cause of an erroneous diagnosis and determination of competency which resulted in the release of the patient and the concurring cause of the death of his wife.

Under Count One, this Court will award damages to the plaintiffs in the amount of Ninety Thousand Dollars ($90,000.).

Under the Survival action, Count Two, this Court will award damages to the plaintiffs in the amount of Ten Thousand Dollars ($10,000.).

Counsel for the plaintiffs shall submit the proper order. The Court requests that counsel for the plaintiffs petition for the appointment of a guardian of the estate of the minor children.