511 A.2d 1371

**Jane and Marcello FESTA,**

v.

**Steven J. GREENBERG, M.D., Appellant.**

Superior Court of Pennsylvania.

Argued April 8, 1986.

Filed June 30, 1986.

Brian M. Peters, Philadelphia, for appellant.

Michael Bloom, Philadelphia, for appellees.

Before CIRILLO, President Judge, and ROWLEY and WIEAND, JJ.

CIRILLO, President Judge:

Appellees initiated this action against appellant-physician asserting that the surgery he performed upon appellee-wife was done in a negligent manner and without proper consent. The trial court originally entered a compulsory nonsuit in appellant-physician's favor because appellees failed to introduce expert testimony to support either of their claims. Subsequently, the trial court granted appellees' motions to remove nonsuit and for a new trial stating that expert testimony is not required to establish a physician's duty to disclose information in informed consent cases. This timely appeal followed.[1]

Appellant, Dr. Steven Greenberg, contends that the trial court erred in removing the compulsory nonsuit in an action in informed consent when: 1) appellees failed to introduce expert medical evidence identifying the actual risks associated with tubal ligation by cauterization; and 2) appellees failed to introduce expert medical evidence demonstrating that the sterilization procedure was the proximate cause of her infection, her pregnancy and the lump in her scar area. We reverse on the basis of the first issue raised by appellant; therefore, we will not address appellant's remaining issue.

**I**

In March 1979, shortly after the birth of her third child, appellee, Jane Festa, contacted appellant regarding a possible sterilization operation. During this consultation, appellant discussed a number of different methods of sterilization with appellees: hysterectomy, tubal ligation, cut and tie procedure, and a vasectomy for appellee-husband. Mrs. Festa testified that she knew what a hysterectomy and

1. The negligence cause of action is not in issue on this appeal. Appellees conceded that their failure to present expert medical testimony to support this claim effectively precluded maintenance of this claim on appeal.

vasectomy involved and that Dr. Greenberg explained the remaining procedures. According to Mrs. Festa's testimony, Dr. Greenberg described the tubal ligation procedure as a burning process: the tube is burnt shut. The final alternative discussed was the cut and tie procedure. Dr. Greenberg informed Mrs. Festa that the instrument used to cut the tubes gave off sparks which in some instances burned vital organs. Mrs. Festa testified that this was the procedure she originally wanted; however, Dr. Greenberg advised her that the tubal ligation method was two times safer and involved a shorter hospital stay than the cut and tie procedure.

Additionally, Dr. Greenberg apprised Mrs. Festa of the failure rate for the tubal ligation, one out of seven hundred, and the cut and tie procedures, one in three hundred to three hundred and fifty. Dr. Greenberg also reported to appellees that no pregnancy resulted in any of the cases in which he had performed tubal ligations. He further reported that in those rare situations when a woman becomes pregnant after a tubal ligation the pregnancy occurs a few years after the operation because the tubes sometimes re-open.

After this discussion, Dr. Greenberg performed a routine gynecological examination upon Mrs. Festa. Upon completion of this exam, Dr. Greenberg provided Mrs. Festa with a consent form to sign. Mrs. Festa testified that she only read the first paragraph and then just glanced at the remaining paragraphs for a minute or two before signing the form.

Approximately two weeks after this consultation, Mrs. Festa entered Rolling Hill Hospital to undergo sterilization by tubal ligation. The week following the operation Mrs. Festa returned to Dr. Greenberg's office where one of his associates examined her and discovered blood clots in her incision. The incision was drained and Mrs. Festa was given antibiotics to ward off infection. Six days later, Mrs. Festa entered Rolling Hill Hospital's emergency room; at

this time, her incision was again drained and a rubber tube inserted and sewn into place to ease the draining problem.

Mrs. Festa testified that it took her a full month to recover from the operation despite Dr. Greenberg's assurances that she would be fine after a few days. Five months after the sterilization procedure, Mrs. Festa discovered that she was again pregnant. Additionally, she claimed that a lump the size of a nickel protruded about one-half inch at the site of her incision. Mrs. Festa stated that she still has the lump below her navel as a result of the operation.

## II

The central issue with which we are presented in this appeal is whether expert medical testimony is required to establish the existence of medically technical risks, the feasibility of proposed alternative treatments and the effect of disclosure upon the patient under the circumstances. Resolution of this question necessitates a discussion of the doctrine of informed consent.

The underlying premise of this doctrine is that a physician is precluded from administering to or operating upon a mentally competent adult patient in non-emergency situations without his consent. "Every human being of adult years and sound mind has a right to determine what shall be done with his own body." *Schloendorff v. Society of N.Y. Hospital*, 211 N.Y. 125, 105 N.E. 92, 93 (1914) (Judge Cardozo). *See also* Dooley, 2 *Modern Tort Law: Liability and Litigation*, § 34:49 *et seq.* (19); Louisell and *Williams*, 2 *Medical Malpractice: Physicians and Related Professions*, §§ 22:01 *et seq.* (1985). In order for the consent to be valid, the physician is duty bound to apprise the patient "of such important matters as the nature of the therapy, the seriousness of the situation, the disease and the organs involved and the potential results of the treatment." *Salis v. United States*, 522 F.Supp. 989, 997 (M.D.Pa.1981) (summarizing *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966).

Imposition of this duty of full disclosure upon the physician is predicated upon the sentiment "that unlike the physician, the patient is untrained in medical science, and therefore depends completely on the trust and skill of his physician for the information on which he makes his decision." *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014, 1020 (1977) (citations omitted). While all jurisdictions agree that a physician is indeed obligated to fulfill this duty, there is significant debate over the scope of the physician's duty and whether expert medical testimony is required to prove the standard of care. The dispute regarding the scope of the physician's duty to disclose focuses on whether this duty should be judged by the reasonable physician/professional standard or the prudent patient standard.

Under the professional standard, the physician's duty to disclose in a particular situation is restricted to the disclosure which the reasonable medical practitioner in the community would have made in a similar situation. The determinative factor is the standard of disclosure to which the medical community adheres for the recommended procedure. *Fuller v. Starnes,* 268 Ark. 476, 597 S.W.2d 88 (1980) (physician's duty to disclose risks is measured by the customary practice of physicians in the community); *Moore v. Underwood Memorial Hospital,* 147 N.J.Super. 252, 371 A.2d 105 (1977) (plaintiff has the burden of proving what a reasonable medical practitioner of the same school and same or similar community, under the same or similar circumstances, would have disclosed to his patient); *Coleman v. Garrison,* 327 A.2d 757 (Del.Super.1974) (plaintiff must establish the custom of the medical community regarding the duty to warn of risks in an informed consent action).

Those jurisdictions which adopted this professional standard of care have advanced a number of arguments to justify their choice:

(1) Only a physician can effectively estimate the psychological and physiological impacts that risk would have on a particular patient. In determining the extent of

disclosure, the physician must consider the state of the patient's health, and whether the risks involved are mere remote possibilities or real hazards which occur with appreciable regularity.

(2) A general standard of care, as required under the prudent patient rule, would require a doctor to waste unnecessary time in reviewing with the patient *every* possible risk, thereby interfering with the flexibility a physician needs in deciding what form of treatment is best for the patient.

Louisell and Williams, 2 *Medical Malpractice: Physicians and Related Professions,* § 22:06 (footnotes omitted) (emphasis provided).

Champions of the professional standard contend that while the "prudent patient" standard may allow some plaintiffs to recover more easily, it does so at the cost of good medical practice. They assert that a physician's primary duty during consultation is the advancement of the patient's best interests; a physician should not have to concern himself with the possibility of a lay jury, untrained in medicine, subsequently deciding that he acted improperly. *Woolley v. Henderson,* 418 A.2d 1123 (Me 1980); *Ross v. Hodges,* 234 So.2d 905 (Miss.1970).

Until the early 1970's, the vast majority of those jurisdictions which recognized the doctrine of informed consent abided by this professional standard. However, in recent years, a growing number of jurisdictions recognized "that protection of the patient's fundamental right of physical self-determination—the very cornerstone of the informed consent doctrine—mandates that the scope of a physician's duty to disclose risks and alternatives be governed by the patient's informational needs." *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014, 1021 (1977). *Accord, Canterbury v. Spence,* 464 F.2d 772 (D.C.Cir.1972); *Harnish v. Children's Hospital Medical Center,* 387 Mass. 152, 439 N.E.2d 240 (1982); *Cross v. Trapp,* 294 S.E.2d 446 (W.Va.1982); *Revord v. Russell,* 401 N.E.2d 763 (Ind.App.1980); *Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wash.2d 151, 530 P.2d 334 (1975).

Pennsylvania adopted the prudent patient standard in the seminal case on informed consent, *Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647 (1971).[2] In *Cooper*, our Court held that a patient's right to know all material facts pertaining to proposed treatment cannot be dependent upon the self-imposed standards of the medical profession. Only under the prudent patient standard is the "maximum effect [given] to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mindreader into the patient's most subjective thoughts or requiring that he disclose *every* risk lest he be liable for battery." *Cooper*, 220 Pa.Super. at 267, 286 A.2d at 650. In determining whether a physician breached his duty to his patient to apprise him of material risks involved in a recommended medical procedure and available alternatives, the standard of care is not what a reasonable medical practitioner would have done in the situation but whether the physician disclosed those risks which a reasonable man would have considered material to his decision whether or not to undergo treatment. In this state, a patient's consent to medical treatment is valid if

the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment ... The physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment.

*Id.*, 220 Pa.Superior Ct. at 267–68, 286 A.2d at 650.

Proponents of the prudent patient standard in Pennsylvania, and other jurisdictions, advance a number of theories to

**2.** The case which propelled the patient need standard to the forefront was *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.1972), *cert. den.* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). In *Canterbury*, the Court held that whether the surgeon's nondisclosure of potential risks relating to a specific medical procedure was reasonable was for the jury to decide. The Court recognized that it is the prerogative of the patient, not the physician, to determine the patient's own best interests.

support rejection of the professional standard. Initially, these detractors of the reasonable physician standard claim that a custom regarding disclosure of risks and alternatives is not readily discernible in the medical community. Even if such a custom does exist, they assert that "it appears so nebulous that doctors become, in effect, vested with virtual absolute discretion." *Cobbs v. Grant*, 8 Cal.3d 229, 243, 104 Cal.Rptr. 505, 514, 502 P.2d 1, 10 (1972). Secondly, these supporters of patient's rights contend that inasmuch as a physician relies on non-medical factors, such as the emotional state of the patient, in determining what risks and alternatives should be disclosed, the medical community's custom regarding disclosure is irrelevant since it would necessarily vary from case to case. The custom of the medical community is only germane when the case requires resolution of a purely medical or technical question. *Defulvio v. Holst*, 272 Pa.Super. 221, 414 A.2d 1087 (1979); *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972). Lastly, adherents to the prudent patient standard posit that the expert medical testimony required under the professional standard imposes an insurmountable burden upon the petitioner in informed consent cases. Patients interested in maintaining such an action encounter great "difficult[ies] in finding a physician who would breach the 'community of silence' by testifying against the interest of one of his professional colleagues." *Cooper*, 220 Pa.Super. at 260, 286 A.2d at 650. *Accord, Sard v. Hardy, supra* (possible conspiracy of silence).

This brings us to the second major area of disagreement regarding the cause of action maintained under the doctrine of informed consent: whether expert medical testimony is required to prove the standard of care. Those jurisdictions which have adopted the professional standard approach ordinarily require the petitioner in informed consent cases to offer medical testimony to establish: 1) whether a reasonable medical practitioner in the same or similar community would make the disclosure, *Taber v. Riordan*, 83 Ill.App.3d 900, 403 N.E.2d 1349 (1980); and 2) that the

physician did not comply with the community's standard of disclosure, *Fuller v. Starnes*, 268 Ark. 476, 597 S.W.2d 88 (1980).

Expert testimony is viewed as a necessity under the professional standard. The determination of what information a patient needs to be informed about proposed medical treatment is considered a medical decision. Only a competent medical practitioner would be capable of establishing a physician's duty to disclose and whether that duty was breached. *Thomas v. Berrios*, 348 So.2d 905 (Fla.App. 1979); *Rodriquez v. Jackson*, 118 Ariz. 13, 574 P.2d 481 (1977).

Under the reasonable man standard, the focus is on what data the patient requires to make an intelligent decision. Therefore, jurisdictions which have adopted this standard routinely waive the expert testimony requirement in respect to the establishment of the scope of a physician's duty to disclose. *Cross v. Trapp*, 294 S.E.2d 446 (W.Va.1982); *Gerety v. Demers*, 92 N.M. 396, 589 P.2d 180 (1978); *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977). *See also,* Annot., 1973, 52 A.L.R.3d 1084; Halligan, *The Standard of Disclosure by Physicians to Patients: Competing Models of Informed Consent,* 41 La.L.Rev. 9 (1980); Katz, *Informed Consent—A Fairy Tale? Law's Vision,* 39 U.Pitt. L.Rev. 137 (1977).

It is well-established in Pennsylvania that in informed consent cases, expert testimony is not necessary to establish the medical community's standard of disclosure. *Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647 (1971); Comment, *Informed Consent in Pennsylvania—The Need for a Negligence Standard,* 28 Vill.L.Rev. 149 (1982–83). The question of whether a physician disclosed risks which a reasonable man would deem material is for the trier of fact. *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966); *Jeffries v. McCague*, 242 Pa.Super. 76, 363 A.2d 1167 (1976). "Although we have a high regard for the professionalism of the medical community, the standard of disclosure exercised therein bears no inherent relationship to the amount of

knowledge that any particular patient might require in order to make an informed choice." *Cooper,* 220 Pa.Super. at 266, 286 A.2d at 650. In *Cooper,* this Court stated that "[t]here is no need to extend the requirement of expert testimony into areas where no technical expertise is necessary." *Id.,* 220 Pa.Superior Ct. at 268, 286 A.2d at 651.

## III

■ In the present case, appellant is not arguing in contravention of the reasonable man standard in informed consent cases. Appellant agrees that this standard allows the aggrieved patient to present his case absent expert medical testimony establishing the physician's standard of care. Appellant's argument is nothing more than that *Cooper* and its progeny do not relieve petitioners in these cases from offering expert testimony to establish the nature of the risks of a proposed medical treatment, the frequency with which those identified risks occur, the nature of available alternative methods of treatment and the feasibility of those alternatives for the particular patient. Appellant concedes that medical testimony is not necessary to establish a patient's informational requirements; he merely asserts that medical testimony is necessary to establish the *existence* of medically technical risks of which the average juror has no knowledge. We agree.

Although expert medical testimony is not mandatory to set forth the scope of a physician's duty to disclose material risks to a patient under the reasonable man standard, we conclude that *such testimony is required to establish the existence of risks* in a specific medical procedure, *the existence of alternative methods of treatment* and the *existence of risks attendant with such alternatives.* In reaching this decision, we are not retreating from the line of reasoning espoused by *Cooper,* and the cases decided subsequent to it; rather, we are interpreting this line of cases as narrowly as they are drawn.

On the question of whether expert testimony is required to prove an action sounding in informed consent, *Cooper* merely rejected the need for such testimony to establish the materiality of risks. Under *Cooper*, materiality is determined by the reasonable man standard. Clearly, "determinations of what a reasonable man would do or consider *significant* within the context of a particular set of facts is standard fare for jurors, for which they need no expert assistance." *Cooper*, 220 Pa.Super. at 268–69, 286 A.2d at 651 (emphasis added) (citations omitted).

Confusion reigns in this area because *Cooper* has been viewed as entirely dispensing with the need for expert testimony in informed consent cases; this is not the case at all. *Cooper* merely exempted petitioners in such cases from presenting expert testimony *to establish the materiality of the risks*. Such testimony is still required to *establish the existence of risks* in a particular medical procedure, the *existence of alternative procedures* and the *feasibility of these alternatives* in the patient's case. Expert medical testimony is essential in this limited context because the average lay juror does not possess the requisite technical or medical knowledge to determine if the facts are true as alleged by the petitioner.

Our holding today is merely an attempt to clarify this Court's position in respect to the need for expert testimony in informed consent cases as originally promulgated in *Cooper;* we find that expert testimony is necessary to establish the existence, magnitude and other relevant scientific characteristics of the risks of a recommended medical procedure and viable alternatives. This decision in no way modifies the rule in this jurisdiction that expert medical testimony is not required to establish the scope of a physician's duty to disclose; it remains for the trier of fact to determine the *materiality* of these risks.

We are not the first reasonable patient jurisdiction to adopt this qualified approach to the need for expert testimo-

ny in informed consent cases. The seminal case on this approach is *Sard v. Hardy, supra.* In this well-reasoned decision, the Maryland Court of Appeals determined that while neither the scope nor the breach of the physician's duty to disclose need be established by expert medical testimony, "such expert testimony [is] required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to a patient." *Id.* 379 A.2d at 1024. *Accord, Cross v. Trapp,* 294 S.E.2d 446 (1982); *Getchell v. Mansfield,* 260 Or. 174, 489 P.2d 953 (1971); *Small v. Gifford Memorial Hospital,* 133 Vt. 552, 349 A.2d 703 (1975). The Court's rationale behind this decision is clear: foregoing the need for expert testimony on the question of materiality vindicates the patient's right to determine what shall be done with his own body and when, while requiring such testimony on the question of whether certain risks exist and the probability of their occurrence insures that the trier of fact is presented with sufficient information to enable it to make a reasoned decision. *See* Comment, *Court Disregard For the Standard of the Profession—The Legislative Response,* 51 Wash.L.Rev. 167 (1975).

In *Smith v. Shannon,* 100 Wash.2d 26, 666 P.2d 351 (1983), the Washington Supreme Court reaffirmed its commitment to the need for expert medical testimony to establish the existence of risks and the probability of their occurrence. *Accord, Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852 (1974), *aff'd per curiam,* 85 Wash.2d 151, 530 P.2d 334 (1975).[3] Quoting *Miller,* the *Smith* Court stated that "once it has been *established by expert medical testi-*

3. In *Miller,* the Court reasoned that in requiring expert medical testimony to establish the *existence* of risks and the probability of their occurrence it was simply applying general rules regarding expert testimony: expert medical testimony is required on only those matters "strictly involving medical science." 2 J. Wigmore, *Evidence* § 568 (Rev.1979).

*mony that a risk existed, then* the existence of the risk is the patient's business; and it is not for the medical profession to establish a criteria [sic] for the dissemination of information to the patient based upon what doctors feel the patient should be told." *Smith,* 100 Wash.2d at 30, 666 P.2d at 354 (citation omitted) (emphasis added). The *Smith* court set forth the determination of materiality as a 2-step process.

> Initially, the scientific nature of the risk must be ascertained, i.e., the nature of the harm which may result and the probability of its occurrence. The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. ... *While the second step of this determination of materiality clearly does not require expert testimony, the first step almost as clearly does.*

*Smith,* 100 Wash.2d at 33, 666 P.2d at 356 (citations omitted) (emphasis added). The court reasoned that only a physician is qualified to determine whether a risk exists and the likelihood of occurrence. "Just as patients require disclosure of risks by their physicians to give an informed consent, a trier of fact requires description of risks by an expert to make an informed decision." *Id. See* Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw.U.L. Rev. 628 (1970).

We are in full agreement with the decisions and rationalizations espoused in these cases. The paramount purpose of the doctrine of informed consent is to allow patients to decide for themselves, after considering all the material information provided, whether to submit to a particular medical treatment or procedure. To accomplish this goal, it is clear that the trier of fact has to be the arbiter of what constitutes a material risk for a patient. However, the trier of fact must be given information as to whether the risks as alleged by the patient actually exist and the likelihood that such risks will actually arise. Only a physician, or other qualified expert, can provide such information.

It is accepted that the lay standard is the prescribed standard in Pennsylvania by which to measure a physician's duty to disclose the material risks inherent in a proposed medical procedure and that such a standard exempts a petitioner in informed consent cases from offering expert medical testimony regarding the physician's duty to disclose risks. In clarifying the *Cooper* decision, we merely hold that expert testimony is still necessary to prove the existence of a risk, its likelihood of occurrence, and the nature of the harm involved.

■ Therefore, in the case *sub judice*, the appellees were required to produce expert testimony to establish the various types of sterilization procedures, the nature of the procedures employed to effect these methods, the failure rates for each respective method and the risk of harm to the patient in each available procedure. Absent expert testimony, appellees failed to introduce sufficient evidence to establish the elements necessary to maintain an action in informed consent. An order granting a nonsuit is proper only if the jury, viewing the evidence and all reasonable inferences arising from it, in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action have been established. *Agriss v. Roadway Exp., Inc.*, 334 Pa.Super. 295, 483 A.2d 456 (1984). Without expert testimony on the question of what risks exist and the probability of their occurrence, the jury would be left to speculate in their attempts to reach an informed decision; this cannot be permitted. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983). Therefore, the trial judge properly determined at the conclusion of appellees' case in chief that a compulsory nonsuit should be entered.

The trial court erred in subsequently removing the nonsuit and granting a new trial. Accordingly, we reverse and reinstate the original order of the trial court.