**Daniel F. CLEARY, Appellant,**

v.

**GROUP HEALTH ASSOCIATION, INC., Appellee.**

**No. 95–CV–1329.**

District of Columbia Court of Appeals.

Argued Feb. 6, 1997.

Decided March 27, 1997.

---

Mona Lyons, with whom Peter Butcher, Washington, DC, was on the brief, for appellant.

Michael F. Flynn, Jr., Washington, DC, with whom Pamela J. Dubret, Rockville, MD, was on the brief, for appellee.

Before FARRELL, KING, and REID, Associate Judges.

KING, Associate Judge:

Daniel F. Cleary appeals the trial court's grant of a directed verdict in favor of Group Health Association ("GHA") entered at the close of all the evidence in Cleary's medical malpractice action, and the trial court's denial of Cleary's motion for a new trial. Cleary contends that he was not required to present medical expert testimony that GHA physicians breached the standards of care, arguing that: (1) the principles of informed consent should apply to his claim that a GHA neurosurgeon conveyed inaccurate information to him about a relatively new treatment option, and (2) with respect to other GHA physicians, expert testimony was not necessary to show breach of a physician's duty to be informed about treatment options, or to refer the patient to another physician, where the physicians were unaware of a particular treatment option. We hold that the trial court did not err in refusing to apply the principles of the informed consent doctrine to Cleary's negligence claim arising from the neurosurgeon's conveyance of allegedly inaccurate information to him, where the circumstantial predicate for that doctrine was not present because the physician was not proposing that the patient undergo a particular procedure or treatment. Therefore, since Cleary did not present expert testimony establishing that GHA breached the standard of care, we hold that the grant of a directed verdict in favor of GHA on this claim was proper. We also hold that because Cleary did not present expert testimony that other GHA doctors, in the circumstances of their contacts with Cleary, breached their duty to be informed of treatment options for his condition or to refer him to a physician who would be familiar with the options, the trial court did not err in directing a verdict in favor of GHA on that claim.

## I.

Because the various contentions of the parties depend on an understanding of the nature of the injury involved and the special medical procedures potentially available for treating it, we begin with a discussion of both. Cleary suffered a severe brachial plexus avulsion ("BPA") injury as a result of a 1978 motorcycle accident—almost all the nerves serving his arm were ripped out of the spinal cord, rendering his arm useless. In addition to the loss of sensory and motor function in his arm, the BPA injury left Cleary with a condition akin to phantom limb pain: he had no nerve sensation in his arm, yet he felt intense pain that seemed to come from his arm but probably emanated from the spine itself. Dr. Bruce Ammerman, a GHA neurosurgeon, treated Cleary for his BPA injury from the time of the accident until January of 1984. Over those six years, Dr. Ammerman either provided, or referred Cleary for, numerous kinds of treatments designed to restore function to Cleary's arm or to relieve his pain. None of the treatments were particularly successful. Cleary saw no GHA physicians from January 1984 until February 1987; from 1987 until 1990 Cleary saw two other GHA physicians a few times, but did not return to them for recommended follow-up visits. In 1990, after a friend informed him of someone who had undergone successful dorsal root entry zone ("DREZ") surgery to relieve a similar pain problem, Cleary sought and received GHA approval to have the procedure done at Duke University Medical Center ("Duke"). The surgery succeeded in reducing his pain by at least eighty percent without producing any significant complications.

The DREZ procedure was developed in the late 1970's and early 1980's, primarily at Duke. It is an arguably experimental major surgical procedure in which neurosurgeons remove bone from the spinal column to gain access to the nerve roots; the roots are then "cooked" with heat or laser, or are otherwise destroyed. This usually, but not always, causes the patient's pain to stop. The procedure carries with it a risk of destroying nerve tissue in addition to the targeted tissue, plus the usual risks of open spine sur-

gery. In addition, once the procedure is performed, there is virtually no possibility of natural nerve regrowth or of surgical attempts to restore motor function.

According to the record in this case, the first published study of the DREZ procedure appeared in a neurosurgical journal in 1979 which reported that sixty percent of DREZ patients experienced some weakness in their ipsolateral (same side) leg as a result of the procedure. In 1981, the same journal published a letter from the study's author stating that he had been able to gain good pain relief results with fewer complications by making the DREZ lesions smaller. Modifications and refinements to the procedure to increase its efficacy and decrease its complications continued until at least 1984. In 1985, after Cleary had stopped seeing Dr. Ammerman, an article in a neurosurgery journal, reporting only a five percent complication rate, became widely available to neurosurgeons in the United States. A study published in 1988 by Cleary's expert witness reported that fifty percent of DREZ patients were free or almost free of pain but forty-one percent had residual pain or other complications from the procedure.

## II.

■ Cleary brought an action alleging that Dr. Ammerman negligently gave him inaccurate information about the efficacy and risks of the DREZ surgical pain relief procedure, thus inducing him to forego the procedure and causing him to endure severe pain for many years. Cleary also alleged that two other GHA physicians who treated him over three years after Dr. Ammerman treated him failed either to inform themselves about the procedure or to refer him to doctors who would know about the procedure.[1]

The trial court ruled that although Cleary had presented expert testimony to establish GHA's duties and to establish the standards of care, Cleary was also required to present expert testimony that GHA's acts or omissions breached the standards of care. Cleary concedes that his is not an informed consent case, and he concedes that he did not present expert testimony on breach. However, he maintains that no expert testimony on breach is required because the principles of the informed consent doctrine should apply where the alleged negligence is a physician's failure to provide completely accurate information about treatment options he discusses with a patient, even when the physician is not proposing or recommending the particular treatment. Cleary also contends that he is not required to present expert testimony that, under the circumstances of his case, the · GHA physicians other than Dr. Ammerman breached their duty to be familiar with treatment options for Cleary or to refer him to another physician who was familiar with the options.

As we have said, we agree with the trial court that informed consent principles do not apply in this case; that expert testimony was required to establish that the information given to Cleary by Dr. Ammerman was so inaccurate as to constitute a breach of the standard of care; and that expert testimony was required to show that the actions of the two GHA physicians, who later saw Cleary only sporadically, breached the standard of care. Therefore, we affirm.

### III. Alleged Negligence of Dr. Ammerman

■ Cleary first sought information from Dr. Ammerman about the DREZ procedure in late 1983 after a referral physician mentioned it, and he and Dr. Ammerman discussed the procedure again in January

---

1. Cleary also contends that the trial court erred by excluding from evidence two documents, a "GHA's Members' Rights and Responsibilities," and "A Patient's Bill of Rights," and by preventing Cleary from cross-examining witnesses about the documents. Cleary argues that these documents establish that GHA members have a right to information about experimental procedures that might be of benefit to them.

These documents do not, by themselves, establish a standard of care—they are not specific guidelines for patient care, *see Lucy Webb Hayes Nat'l Training School v. Perotti*, 136 U.S.App.D.C. 122, 419 F.2d 704, 712 (1969); *Hicks v. United States*, 357 F.Supp. 434 (D.D.C.1973). Nor did Cleary present expert testimony to the effect that GHA physicians had a duty to provide Cleary with information about experimental procedures. Therefore we reject Cleary's claim.

1984. At no time did Dr. Ammerman propose or recommend that Cleary undergo the procedure. There is no dispute that Dr. Ammerman had read the available published materials about the DREZ procedure prior to these consultations, and there is no dispute that Dr. Ammerman informed Cleary that he might benefit from the procedure and informed Cleary that there was a risk of resulting weakness or paralysis in his ipsilateral leg. Neither party disputes that information about risk of leg weakness or paralysis was material to Cleary because of Cleary's inability to use his injured arm to support himself with a cane. In short, if he could not walk without a cane, he probably would not be able to walk at all. Nor is there any dispute that the reason Cleary did not seek GHA's authorization for treatment with this procedure in 1984 was because he was concerned about that risk.

The only factual disputes are whether Dr. Ammerman gave Cleary inaccurate information about the risks and benefits of the DREZ procedure,[2] and whether Dr. Ammerman should have known, at the last consult in January 1984, that the information was inaccurate, i.e., should have known that any leg weakness associated with the DREZ procedure was unlikely to render Cleary non-ambulatory. The trial court found that Cleary established a standard of care—that once a physician provides information to a patient, he has to provide accurate information. However, the trial court ruled that, assuming Dr. Ammerman's advice was inaccurate and assuming the information was material to Cleary, expert testimony was required to establish that the inaccuracy was so significant or of such magnitude that it deviated from the standard of care. The court also ruled that Cleary had not presented such testimony.

To establish that Dr. Ammerman was negligent, Cleary presented Dr. Allan Friedman, the physician who performed the DREZ procedure on Cleary, as an expert. He testified that based on information available in the neurosurgery literature: a reasonably prudent physician treating a BPA patient in 1979 would be aware that the DREZ procedure existed; by 1984 it was well established that the procedure was efficacious and had a lower risk of complications than previously reported; and by 1984 it would be reasonable for a physician treating a BPA patient to discuss DREZ with the patient. Dr. Friedman testified, in terms of his own experience, that he always tells a DREZ patient about possible resulting weakness and numbness, but that he has had no DREZ patients who required a cane or walker. In addition, as the trial court recognized, there was evidence that the information provided to Cleary was not completely accurate: in response to a hypothetical posed by Cleary, Dr. Friedman testified that, in late 1983 or early 1984, it was "not in keeping with what's in the literature" to have advised a patient that he would likely become non-ambulatory if he had the DREZ procedure; and Dr. Ammerman and a GHA expert medical witness both conceded that there are no references in the medical literature to any DREZ patient becoming non-ambulatory or having a completely paralyzed ipsilateral leg. However, importantly, Dr. Friedman also testified that in January 1984 it was not unreasonable to tell a patient considering the DREZ procedure that a known complication might be resulting weakness in the ipsilateral leg. Significantly, too, Dr. Friedman expressly stated that he was not giving an opinion that Dr. Ammerman breached the standard of care, because he had never been provided with, or reviewed,

2. Dr. Ammerman testified that he informed Cleary that the DREZ procedure carried with it a substantial risk of weakness or paralysis of the ipsilateral leg, but denied telling Cleary that he would likely have to use a cane or become non-ambulatory. However, in response to Cleary's counsel's question, "Weakness that would render him, non-ambulatory in a wheelchair, isn't that what you told him?" Dr. Ammerman answered, "Yes, can I have the article please?" (He had just requested a copy of an article referred to by counsel).

Cleary testified that Dr. Ammerman told him that the procedure would probably result in leg weakness that would necessitate use of a cane, and that when Cleary pointed out that he could not use a cane, Dr. Ammerman said "that's right." Cleary also testified that Dr. Ammerman "stated quite strongly" that the DREZ procedure might result in some impairment or disability in his ipsilateral leg, and used the word "paralysis" in discussing possible complications.

Cleary's entire GHA file. Cleary presented no other expert testimony bearing on Dr. Ammerman's advice to Cleary.

■ Generally, in a medical malpractice negligence action the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries. *See Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996); *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990); *Harris v. Cafritz Memorial Hosp.*, 364 A.2d 135, 137 (D.C.1976). Although there are cases which do not require expert testimony on the issue of breach, *i.e.*, cases "[w]here laymen can say, as a matter of common knowledge and observation, that the type of harm would not ordinarily occur in the absence of negligence," *Harris, supra*, 364 A.2d at 137, expert testimony is required "if a case involves the merits and performance of scientific treatment, complex medical procedures, *or the exercise of professional skill and judgment,* [because] a jury will not be qualified to determine whether there was unskillful or negligent treatment without the aid of expert testimony." *Id.* (emphasis added); *see also Washington Hosp. Ctr. v. Martin*, 454 A.2d 306, 308 (D.C.1982). Cleary's claim that Dr. Ammerman was negligent hinges on whether Dr. Ammerman's interpretation of medical information available in neurosurgery journals was unreasonably inaccurate. Interpretation of medical literature, and the application of that interpretation to a particular patient's circumstances, is an exercise of medical judgment, and is not a subject within the ken of lay jurors. *See Nimetz v. Cappadona*, 596 A.2d 603, 606 (D.C.1991) (expert testimony is required when "the subject presented is 'so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson'") (quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987)); *Canterbury v. Spence*, 150 U.S.App. D.C. 263, 276–78, 464 F.2d 772, 785–87 (1972) (prevailing medical practice must be considered when medical judgment is at issue; ordinarily, only the physician is in a position to identify particu-

lar dangers); *Festa v. Greenberg*, 354 Pa.Super. 346, 511 A.2d 1371, 1378 (1986) ("only a physician is qualified to determine whether a risk exists and the likelihood of occurrence"). *Cf. Washington Hosp. Ctr. v. Martin, supra*, 454 A.2d at 308 (expert testimony not required where issue before jury is whether appellee was in fact under restraints immediately prior to her fall); *Washington Hosp. Ctr. v. Butler*, 127 U.S.App. D.C. 379, 385, 384 F.2d 331, 337 (1967) (expert testimony not required on issue of whether order for diagnostic test should have noted patient's dizziness when doctor had noted the symptom on patient's admission note). As is apparent, Dr. Friedman did not give the required opinion testimony on breach; indeed, appellant concedes as much in his reply brief. Therefore, unless there is some other theory that relieves Cleary of his burden to present expert testimony establishing that Dr. Ammerman breached the standard of care, his claim fails for the lack of such testimony.

■ In response, Cleary contends that the principles of the informed consent doctrine should apply to his claim because the conduct alleged to be negligent concerns information conveyed from a physician to his patient. Thus, he argues, expert testimony was not necessary to establish breach because "if the jurors were to determine that Dr. Ammerman had 'overstated the risk in his conversation with Mr. Cleary,' then in light of the expert testimony presented at trial, they would have been able to determine whether that overstatement was a deviation from the standard of care." He further maintains that, under the informed consent doctrine, expert testimony is not required to establish a breach of the standard of care because the issue is "whether a reasonable person in what the physician knows or should know to be the patient's position would consider the information material to his decision." *See, e.g., Crain v. Allison*, 443 A.2d 558, 562 (D.C.1982).

■ Under the informed consent theory, the determination of materiality is a two-step process. First, expert testimony is "required to establish the nature of the risks inherent in a particular treatment, the probabilities of

therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment and whether or not disclosure would be detrimental to a patient." *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014, 1024 (1977). "Once the physician has ascertained the risks and alternatives, and has communicated this information to the patient," *id.*, the second step is reached, where

> it is the patient's exclusive right to weigh these risks together with his individual subjective fears and hopes and to determine whether or not to place his body in the hands of the surgeon or physician. No question requiring the exercise of medical judgment ever arises at this stage of the decision-making process.

*Id.* (citations omitted). *See also Canterbury, supra*, 150 U.S.App. D.C. at 282–83, 464 F.2d at 791–92 (experts are required to identify and elucidate the risks of therapy, but lay witnesses can competently establish failure to disclose risk information, a patient's lack of knowledge of the risk, and the adverse consequences following treatment); *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 513–14, 502 P.2d 1, 10 (1972);[3] *Festa, supra*, 511 A.2d at 1376–78.[4]

The principles of informed consent do not apply to the circumstances presented here, however, because the allegations of negligence in this case do not turn on whether the risks disclosed by Dr. Ammerman were material—the parties agree that a risk of paralysis or weakness in the ipsolateral leg was important to Cleary, and that Dr. Ammer-

man knew that was so. Instead, the allegations of negligence center on the reasonableness of Dr. Ammerman's interpretation of the available medical literature, *i.e.*, whether, in the exercise of ordinary care expected of a neurosurgeon treating a BPA patient, Dr. Ammerman should have been aware that the DREZ procedure was not likely to render Cleary non-ambulatory. *Cf. Sard, supra*, 379 A.2d at 1022–23 ("where the physician does not know of a risk and should not have been aware of it in the exercise of ordinary care, he is under no obligation to make disclosure"). As we have said, the reasonable interpretation of medical literature is not a subject within the ken of lay jurors.

Furthermore, we agree with the trial court that the circumstances here are not sufficiently analogous to those found in informed consent cases so as to allow the application of informed consent principles. The physician here was not proposing a particular treatment for the patient to accept or reject, but discussing with the patient various possible courses of treatment. We think these circumstances are like those in the diagnosis and treatment medical malpractice cases.

For example, in *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972), ordinary medical negligence theory claims and an informed consent theory claim were at issue on appeal. Wilkinson claimed that the physicians incorrectly diagnosed her ailment, improperly administered treatment, and failed to obtain her knowing consent. Although the *Wilkinson* court held that expert testimony was not required on the informed consent

---

**3.** A medical doctor, being the expert, appreciates the risks inherent in the procedure he is prescribing, the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment. But once this information has been disclosed, that aspect of the doctor's expert function has been performed. The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill.

*Cobbs*, 104 Cal.Rptr. at 514, 502 P.2d at 10.

**4.** "[O]nce it has been *established by expert medical testimony that a risk existed, then* the existence of the risk is the patient's business; it is not for the medical profession to establish a criteria [sic] for the dissemination of information to the patient based upon what doctors feel the

patient should be told." The ... determination of materiality [is] a 2–step process.

> Initially, the scientific nature of the risk must be ascertained, i.e., the nature of the harm which may result and the probability of its occurrence. The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment.... *While the second step of this determination of materiality clearly does not require expert testimony, the first step almost as clearly does.*

[] only a physician is qualified to determine whether a risk exists and the likelihood of occurrence.

*Festa*, 511 A.2d at 1377–78 (emphasis in original) (quoting *Smith v. Shannon*, 100 Wash.2d 26, 666 P.2d 351, 354 (1983)).

claim to show the reasonableness or unreasonableness of the extent of a physician's communication with the patient, it also stated, on the diagnosis and treatment claims, that expert testimony was required to demonstrate any deviation from the standard of care. *See id.* 295 A.2d at 682. The factual issues in Wilkinson's diagnosis and treatment claims centered on the merits and performance of scientific treatment or the exercise of professional skill and judgment, and were much like the factual issues raised by Cleary: Did the physicians follow good practice protocol? Whose responsibility was it to make recommendations for treatment? Did the physicians fail to avail themselves of the scientific means and facilities available to obtain the best factual data? *See id.* at 682–85. *See also Schenck v. Roger Williams Gen. Hosp.*, 119 R.I. 510, 382 A.2d 514 (1978) (negligent diagnosis claim included physician's failure to conduct a test, consult a report, or perform an examination, *i.e.*, utilize the scientific advancements available to him). For this type of claim, expert testimony is required to show not only the standard of care, but also to demonstrate any deviation from that standard. *See Allen v. Hill*, 626 A.2d 875, 877 (D.C.1993); *Washington v. Washington Hosp. Ctr., supra*, 579 A.2d at 181 (expert testimony is usually required to establish each element of medical malpractice claim); *Wilkinson, supra*, 295 A.2d at 682.

■ Moreover, in contrast to the issue in this case, informed consent claims concern a duty of the physician "which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills." *Wilkinson, supra*, 295 A.2d at 685. In order to prevail in an action based on a theory of informed consent, "the plaintiff must prove that if he had been informed of the material risk, he would not have consented to the procedure and that he had been injured as a result of submitting to the procedure." *Id.* at 690; *see also, e.g., Kelton v. District of Columbia*, 413 A.2d 919, 922 (D.C. 1980) ("a breach of duty to disclose . . . is not actionable in negligence unless it induces the

patient's uninformed consent to a risky operation from which damages actually result"). The factual issues in an informed consent case revolve around materiality; those not requiring expert testimony typically ask a jury to determine whether an unrevealed risk materialized, whether the physician told the patient about that risk, and whether the physician should have known that knowledge of that risk might affect the patient's decision. *See id.* 295 A.2d at 688–89; *see also Crain, supra*, 443 A.2d at 563; *Canterbury, supra*, 150 U.S.App. D.C. at 277–79, 281, 464 F.2d at 786–88. As we have said, these are not the kind of factual issues raised by Cleary. Therefore, Cleary cannot invoke informed consent principles to bypass the requirement that he present an expert opinion that Dr. Ammerman breached his duty to give Cleary accurate information about the DREZ procedure.[5]

## IV. Alleged Negligence of Other GHA Physicians

■ Cleary also contends that expert medical testimony was not necessary to establish that the two GHA physicians he saw in 1987 and 1989 breached the applicable standard of care because the physicians admitted that they did not know about the DREZ procedure and because they did not refer him to other physicians who would. The trial court ruled that Cleary had established that the standard of care required physicians treating a particular patient to be familiar with treatment options or to refer the patient to another physician, but that Cleary had not established that, under the circumstances of this case, the GHA physicians violated that duty.

It is undisputed that Dr. Pournaras and Dr. Kelly, who were not neurosurgeons like Dr. Ammerman, did not know about the DREZ procedure and did not refer Cleary to other physicians regarding the procedure. However, as the trial court noted, Cleary's contact with the physicians was sporadic. He saw Dr. Pournaras on only two occasions, once in February and again in March of 1987. Treatment was prescribed, but Cleary did

---

5. Because this is not an informed consent case, we do not decide whether Cleary would have

sufficiently established the elements of a claim under that theory.

not return for recommended follow-up care. Cleary also failed to return for the recommended follow-up visit to Dr. Kelly, who saw Cleary on one occasion in 1989.

█ In medical malpractice negligence actions, the standard of care by which the physician's conduct is measured is the care "that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984); *Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C.1979) (the duty of care is "that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances"). Cleary's only expert witness, Dr. Friedman, was unable to opine whether the GHA doctors violated the standard of care because he had not reviewed Cleary's GHA medical records. Although in some circumstances a lay jury may be able to determine whether a physician's conduct breached the duty to be informed or to refer, we think the facts of this case put it beyond the ken of lay jurors. Here, the procedure in question was evolving over time, and there was no continuing relationship between Cleary and the physicians. The physicians advised Cleary to undertake certain types of treatments, but because he did not return for the follow-up visits, they had no way to know whether the treatments they prescribed were or were not successful. Both Dr. Pournaras and Dr. Kelly testified that such follow-up visits might have resulted in a referral to specialists familiar with the DREZ procedure. Under these circumstances, it was not error for the trial court to require expert testimony to establish a breach of the standard of care. *See Nimetz, supra,* 596 A.2d at 605–06 & n. 4 (expert testimony required on breach of the standard of care in a failure to consult case where evidence established that the physician admitted that he had not seen the patient's medical situation before and admitted he did not consult with a more knowledgeable physician; an average layperson, even after applying common sense, would not be equipped to decide whether the failure to consult during the time in question deviated from the course that a reasonably prudent physician with the defendant's specialty would have taken under

the same or similar circumstances). Because Cleary did not present the required expert testimony establishing that Drs. Pournaras and Kelly breached the standard of care in these circumstances, we hold that the trial court's grant of a directed verdict in favor of GHA on this issue was proper.

## V.

For the foregoing reasons, we affirm the trial court's grant of GHA's motions for directed verdict. Cleary also filed a motion for a new trial grounded on the asserted errors made by the trial court in granting the motions for directed verdicts. In affirming the trial court's rulings on those issues, we necessarily hold that the trial court did not err in denying the motion for a new trial on the grounds asserted.

*Affirmed.*